(No. 82527.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ULECE MONTGOMERY, Appellant.

*Opinion filed June 15, 2000.—Rehearing denied October 2, 2000.*

644

HARRISON, C.J., and McMORROW, J., dissenting.

Robert T. Markowski, Edward F. Malone and Benjamin C. Weinberg, of Jenner & Block, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Ulece Montgomery, brings this appeal from an order of the circuit court of Cook County denying him post-conviction relief. Because the defendant received the death sentence for the underlying convictions, the present appeal lies directly to this court. 134 Ill. 2d R. 651(a). We now affirm the judgment of the circuit court.

The transcripts of the defendant's trial proceedings are included in the present record, and we will summarize here the evidence presented at the guilt and sentencing phases. The offenses for which the defendant was convicted and now seeks post-conviction relief occurred in Robbins on April 25, 1981. On that date two women, Pearl Briggs, 72 years old, and Betty Tyson, 68

years old, were raped and murdered. The defendant, who was 24 at the time, later confessed to committing these offenses. The defendant and his girlfriend rented an apartment from the two victims, who lived together in a separate building on the property. According to the defendant's statement, which was introduced into evidence at trial, Briggs had offered to give a couch to the defendant and his girlfriend. During the afternoon of April 25, the defendant went to obtain the couch from the two women. The couch was in the basement apartment of the building in which the victims lived, and Briggs got keys and a flashlight and led the defendant to the lower level. As Briggs helped the defendant move the couch, it fell on his foot, and the defendant became angry with her. The defendant then hit Briggs, and she fell to the floor. The defendant dragged her to the kitchen in the apartment. She did not seem to be conscious, and the defendant removed the woman's clothes and raped her.

The defendant then picked up the keys and flashlight and went upstairs to return those things to Tyson. Tyson opened the door, and the defendant handed the items to her. The defendant began to leave, but he then turned and pushed Tyson, who fell. The defendant removed the woman's hose and wrapped them tightly around her neck. The defendant said that he then applied baby oil to his penis and raped Tyson.

A member of the church attended by the two victims called the women's great niece when they failed to appear at a church function that day. The great niece went to their address and summoned the police when she believed she saw a shadow behind their door. Police officers found Briggs with her dress pulled up and her genital area exposed. Subsequent forensic testing disclosed the defendant's fingerprint was discovered on a lens of Briggs' eyeglasses. Blood spatters found on the defendant's jacket were consistent with Briggs' blood type but

not with his own, and a head hair found under Briggs' fingernail was consistent with the defendant's hair. An autopsy revealed that the cause of death for Briggs was strangulation.

Like Briggs, Tyson was found partially clothed, with her genital area exposed. A bottle of baby oil was lying next to her on the floor. The defendant's palm print was later found on a camera case sitting on a couch near Tyson. Blood spatters found on the defendant's dress shirt were consistent with Tyson's blood type, but not with the defendant's own. Also, a head hair found on the defendant's undershirt was consistent with Tyson's hair. According to the autopsy evidence, Tyson's cause of death was ligature strangulation.

Police arrested the defendant that evening. At the time, the defendant had scrapes on his hands and spatters of blood on his pants. The defendant told police that he had injured himself while trying to repair his bicycle. Fingerprints and hair samples were taken from the defendant at this time. The defendant was released, but he was arrested again on April 27, after authorities learned that the defendant's fingerprint and palm print had been found on articles at the women's residence. The defendant then gave a statement in which he confessed his commission of the crimes described above.

The defendant originally chose to be tried by a jury. Shortly after jury selection began, however, a mistrial was declared when the defendant attempted to commit suicide one night in his cell; it appears that during the day's proceedings the defendant had overheard a prospective juror say that he could decide to convict the defendant simply by looking at him. The defendant later elected to submit the case to the trial judge alone, in a stipulated bench trial. At the conclusion of the trial, the judge found the defendant guilty of the two murders. The defendant also chose to waive a jury for purposes of

a death penalty hearing, which was conducted before the same judge. In the first stage of the sentencing hearing, the parties stipulated to the introduction of the evidence presented at trial. The judge found the existence of two statutory aggravating circumstances that rendered the defendant eligible for the death penalty: the murder of more than one person, and the commission of murder during another felony, rape. Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(b)(3), (b)(6).

During the second stage of the sentencing hearing, the parties again stipulated to the introduction of the trial evidence, and they presented additional evidence in aggravation and mitigation. The State introduced evidence of the defendant's criminal history, which revealed one conviction for contributing to the sexual delinquency of a minor and two convictions for possession of stolen motor vehicle. The State also introduced testimony from Lynn Rosiejka, a social worker who had interviewed the defendant's mother, Carolyn Montgomery, in 1976, when he was charged with contributing to the sexual delinquency of a minor. Rosiejka testified that Carolyn said that the charge against the defendant was based on two acts of intercourse with his half sister, Jean, who was then 11 years old; the defendant was 19. According to Rosiejka, Carolyn also said that the defendant had raped his half brother Eugene six years earlier, and had attempted to rape his sister Rene a year before that. Carolyn told Rosiejka that the defendant routinely carried guns and knives. Rosiejka also stated that after the attack on Eugene, the defendant was sent to the Audy Home. After his release, the defendant went to live with an aunt in Evanston. The aunt could not control the defendant, however, so he then returned to his mother. When Carolyn was unable to control the defendant, he was sent again to the Audy Home, and he became a ward of the court. The defendant then lived in different foster homes for a period.

On cross-examination, defense counsel elicited from Rosiejka testimony about the defendant's background that the defense believed would be mitigating. According to this information, Carolyn was an alcoholic, and Carolyn acknowledged that she had been being hospitalized at least once for her alcoholism. The defendant's father was an alcoholic and a drug abuser, and he had left the family when the defendant was young. According to Rosiejka, Carolyn said that the defendant's older brother, Douglas, had been a bad influence on the defendant, and the defendant and Douglas had lived on the streets for some time.

Carolyn Montgomery testified in the defendant's behalf at the sentencing hearing. She said that she has six children; the defendant is the second oldest. She described in her testimony the defendant's turbulent childhood and the difficulties he had encountered while growing up. She said that her first husband, Douglas Montgomery, was an alcoholic and drug addict who would beat her. Carolyn said that she also had been an alcoholic, until seven years ago. She would drink every day and was often absent from the home, spending her time in taverns. Drinking caused her to be mean, and she would beat her children. On one occasion, she beat the children so severely that their grandmother had to take them from her and "heal them up." Because of her continual intoxication, she was often unable to care properly for her children. She would bring food home but would not cook for the family. As a result, the children were left to fend for themselves.

At the sentencing hearing, Carolyn also recounted the series of homes in which the defendant lived while growing up. She testified that the defendant was seven when the family moved to Harvey, in 1963. The defendant began to have problems after that age. When the defendant was 10, he began to stay out all night with his

older brother, Douglas; they would sleep in abandoned cars or buildings. She later took the defendant to the Audy Home because she could not control him. Later, Carolyn's sister took the children to her home in Evanston, and at one point became their guardian. Carolyn testified that she lost custody of the children because she was not fit. When the defendant was 11, he returned to his mother's home, in Robbins. She testified that she knew the defendant needed help; he began drinking when he was in junior high school, and he was unable to control his behavior when he was drunk. When the defendant was 16, he was sent to a school in Wisconsin. After that, he was placed in foster care in Chicago, and then lived in a group home in Chicago. Also, Carolyn denied that the sexual incidents involving Eugene or Rene had occurred; she explained that if she did mention them to Rosiejka, she was simply trying to obtain help for her son.

Three of the defendant's siblings testified in his behalf at the capital sentencing hearing. Jean Hayes acknowledged that the defendant had raped her, but she otherwise provided favorable testimony. Both Eugene Hayes and Rene Littleton denied that the defendant had ever molested or assaulted them, and they, too, spoke favorably of their brother. The defense also called as a witness Douglas Meyer, a Lutheran pastor who regularly visited the defendant while he was facing trial on the charges involved here. Meyer described the defendant as being cooperative and respectful and said that he was never threatening or aggressive. Meyer believed that the defendant was becoming more religious while he was incarcerated.

The defendant also presented testimony from two relatives with whom he had lived while growing up. Melva Alexander, one of Carolyn Montgomery's sisters, testified that she would sometimes have to take care of Carolyn's children when Carolyn was drinking. Alexan-

der said that the defendant first lived with her, in Evanston, when he was about four years old. Some years later, she acquired custody of the defendant and his older brother when the defendant was 10 or 11, and he then lived in her home for about three years. Carolyn was still drinking a lot at that time, and the children had to raise themselves. Alexander testified that she did not have any problems with the defendant at home, but that he was experiencing problems in school. A teacher and a school counselor told her that the defendant need psychiatric help, but he did not receive any treatment at that time.

Viola Lattimore, who is also a sister of Carolyn and Melva, similarly testified about Carolyn's drinking habits. Lattimore said that Carolyn would get mad and hit the children. Lattimore was also living with Alexander when the defendant came to live in Evanston at the age of 10, and she described the defendant as being quiet and well-mannered. She believed that the defendant had mental problems and said that he never received help when he was little.

Defense counsel presented expert psychiatric testimony regarding the defendant's mental condition. Dr. Stephen Porter, a psychiatrist, had examined the defendant and had reviewed records pertaining to the case. Dr. Porter learned that the defendant had an extensive history of alcohol and drug abuse. Dr. Porter found that the defendant had grown up in a chaotic home. Both parents drank heavily, and there was much physical violence. The defendant had little supervision, and by the time he was 9 or 10 years old he often wandered the streets with his older brother, spending the nights in abandoned cars or buildings. Dr. Porter also noted that the defendant had a number of different residences from the age of 10 on, living at the Audy Home, with relatives, in a state shelter, and in a group home. Dr. Porter concluded that the defendant was a chronic alcoholic and drug abuser

and that he had an antisocial personality. Dr. Porter believed that the defendant committed the present offenses while under the influence of extreme mental or emotional disturbance, a statutory mitigating circumstance. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2). In Dr. Porter's view, the consumption of alcohol and drugs by the defendant on the day of the offenses had impaired his judgment and self-control.

The defense presented further expert testimony through Dr. Albert Stipes, a psychiatrist at the Cook County Psychiatric Institute, who had also examined the defendant and reviewed records in the case. The defendant told Dr. Stipes about his history of alcohol and drug abuse. According to this information, during a five-year period the defendant consumed about a quart of wine a day, and also drank rum and beer. The defendant used drugs, too, taking as many as five amphetamines daily during a six-month period. The defendant had a history of alcoholic blackouts. Dr. Stipes diagnosed the defendant as having continuous alcoholic dependence and antisocial personality disorder with stimulant abuse. Dr. Stipes testified that he did not have any significant disagreement with Dr. Porter's assessment, though Dr. Stipes declined to say whether the defendant was acting under an extreme mental or emotional disturbance when he committed the offenses. Dr. Stipes explained that those are not medical terms.

After hearing the parties' evidence, the trial judge found that there were no mitigating circumstances sufficient to preclude a sentence of death, and the judge therefore sentenced the defendant to death for the two murder convictions. This court subsequently affirmed the defendant's convictions and death sentence (*People v. Montgomery*, 112 Ill. 2d 517 (1986)), and the United States Supreme Court denied the defendant's petition for a writ of *certiorari* (*Montgomery v. Illinois*, 479 U.S. 1101, 94 L. Ed. 2d 181, 107 S. Ct. 1329 (1987)).

The defendant then commenced the present action in December 1987 by filing a post-conviction petition in the circuit court of Cook County. Following an evidentiary hearing on a portion of the defendant's petition, the circuit judge denied all post-conviction relief. In an appeal from that ruling, this court found that the circuit judge had improperly restricted certain avenues of inquiry in the defendant's cross-examination of two witnesses. Accordingly, this court remanded the cause for further proceedings. *People v. Montgomery*, 162 Ill. 2d 109 (1994). On remand, the case was assigned to a different circuit judge, and a fresh evidentiary hearing was then held on portions of the post-conviction petition. The evidence presented at the hearing focused on two discrete issues: first, whether the judge who presided at the defendant's trial and sentencing hearing had assured defense counsel that the defendant would receive a sentence other than death if the defendant waived a jury and pleaded guilty to the charges, and, second, whether trial counsel was ineffective for failing to investigate the defendant's background further and present the information at the sentencing hearing. At the conclusion of the evidentiary hearing, the judge denied all post-conviction relief sought by the defendant. Because the defendant received the death penalty for the underlying convictions, his appeal is to this court. See 134 Ill. 2d R. 651(a). We now affirm the judgment of the circuit court.

I

As a preliminary matter, we note the scope and purpose of post-conviction relief. The Post-Conviction Hearing Act (725 ILCS 5/122—1 through 122—7 (West 1996)) affords a means by which a defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. *People v. Tenner*, 175 Ill. 2d 372, 377 (1997). An action for post-conviction relief is a collateral proceeding, not an appeal from the prior judg-

ment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999). To be entitled to post-conviction relief, a defendant must demonstrate a substantial deprivation of federal or state constitutional rights in the proceedings that resulted in the conviction or sentence being challenged. *People v. Morgan*, 187 Ill. 2d 500, 528 (1999). Considerations of *res judicata* and waiver narrow the scope of post-conviction relief "to constitutional matters which have not been, and could not have been, previously adjudicated." *People v. Winsett*, 153 Ill. 2d 335, 346 (1992). Accordingly, issues that were raised on appeal from the underlying judgment of conviction, or that could have been raised but were not, ordinarily will not be considered in a post-conviction proceeding. *People v. West*, 187 Ill. 2d 418, 425 (1999). Determinations made by the post-conviction court following an evidentiary hearing on the petition will not be disturbed on review unless they are manifestly erroneous. *People v. Childress*, 191 Ill. 2d 168, 174 (2000); *People v. Coleman*, 183 Ill. 2d 366, 385 (1998); see also *People v. Morgan*, 187 Ill. 2d 500, 528 (1999); *People v. Neal*, 179 Ill. 2d 541, 554 (1997).

In this appeal, the defendant renews the two principal contentions that informed the evidentiary hearing conducted on our remand from the defendant's earlier post-conviction appeal. We first consider the defendant's argument that the judge who presided at the defendant's trial and sentencing hearing, in 1983, allegedly promised trial counsel that he would not sentence the defendant to death if the defendant pleaded guilty and selected a bench sentencing hearing. On remand following the earlier post-conviction appeal, the circuit judge conducted an extensive evidentiary hearing on the defendant's claim that trial counsel had received an assurance from the trial judge regarding the sentence in the case. At the new evidentiary hearing, post-conviction counsel was permitted to question the trial judge, Judge Samuels, and his

court reporter, Shirley Thompson, on the subjects previously barred, as this court had instructed in reversing the circuit court's initial decision denying post-conviction relief. *People v. Montgomery*, 162 Ill. 2d 109, 113 (1994). On remand, the defendant introduced testimony from his two trial lawyers, John J. McNamara and Michael J. Morrissey, as well as from several other persons who, the defendant contends, are able to support trial counsel's testimony describing their *ex parte* meetings with Judge Samuels.

According to the defendant's evidence, three meetings occurred between defense counsel and Judge Samuels at which *ex parte* communications regarding the defendant's sentence were made. One meeting was between McNamara and the judge, another meeting was between Morrissey and the judge, and the third meeting was between both lawyers and the judge.

McNamara was lead counsel in the defendant's case. At the evidentiary hearing, he testified that prior to the initial trial date, which ended in a mistrial, he asked Judge Samuels to conduct a Rule 402 plea conference, but the judge declined to do so because the State would not take part. McNamara stated that he went to the Markham courthouse in April 1983 to inform Judge Samuels that there was no need to schedule a fitness hearing in the case because a psychiatric report made after the defendant's suicide attempt showed that the defendant was fit. According to McNamara, he entered Judge Samuels' chambers and sat down; no one else was present. He and the judge discussed the amount of time that would be needed for trial and sentencing. According to McNamara, after he told Judge Samuels what evidence the defense planned to present at trial and sentencing, the judge suggested that the defendant should probably plead guilty. McNamara replied that he could not advise a defendant to plead guilty without first obtaining a com-

mitment from the sentencing judge that the death penalty would not be imposed. According to McNamara, Judge Samuels then urged him to " 'look at my record.' " McNamara testified at the evidentiary hearing that he construed this comment to mean that the defendant would not receive the death penalty if he waived a jury for sentencing and chose instead to be sentenced in a bench proceeding. McNamara said that he told Morrissey about his conversation with Judge Samuels the next time he saw Morrissey, which he believed was later the same day. According to McNamara, Morrissey reported that he, too, had had a conversation with the judge, in which the judge suggested that he would sentence the defendant to life if the defendant pleaded guilty.

McNamara also testified that at some point he spoke to Judge Samuels' court clerk, Moses Cole, about the case. McNamara stated that he originally believed that the conversation with Cole occurred the same day that he spoke to the judge, but that he had since learned that Cole was not at work that day. According to McNamara's testimony, Cole approached the lawyer and said that the defendant should choose a bench sentencing proceeding because Cole did not believe that Judge Samuels would impose the death penalty in this case. McNamara also testified to a conversation he had had with Shirley Thompson, the court reporter assigned to Judge Samuels' courtroom. According to McNamara, Thompson said that she did not believe that the judge would sentence anyone to death. McNamara testified that he was not sure when the conversation with Thompson occurred.

Paul Foxgrover, a friend of McNamara, described in an affidavit conversations he had had with McNamara concerning Judge Samuels' alleged sentencing promise. In the affidavit, Foxgrover stated:

"4. In the spring of 1983, Mr. McNamara told me that he and Mr. Morrissey had spoken with Judge Samuels about the Ulece Montgomery case. Mr. McNamara said

that Judge Samuels told them that if Mr. Montgomery did not contest the issue of guilt and submitted the sentencing decision to him, he would not consider the death penalty.

5. My discussion with Mr. McNamara revolved around possibly advising Mr. Montgomery to waive the jury and to proceed to the stipulated bench trial and sentencing on reliance on Judge Samuels' comments. I told Mr. McNamara, based on his description of what Judge Samuels said, that he could rely on Judge Samuels' comments and encourage a waiver."

The parties stipulated at the hearing that Foxgrover pleaded guilty in July 1992 to charges of felony theft contained in two separate Cook County indictments, and that he received concurrent prison terms of six years, three years, and nine months for those offenses.

Michael Morrissey also testified at the post-conviction hearing regarding the alleged *ex parte* conversations with Judge Samuels. Morrissey said that in April 1983, he met alone with the judge in his chambers to discuss scheduling. Morrissey referred to certain conflicts in his schedule. According to Morrissey, Judge Samuels said, " 'Why don't you guys have Ulece plead guilty. I'll give him life. You know my record in these kinds of cases.' " Morrissey further testified that the judge then leaned back in his chair and said, " 'Oh, the cat's out of the bag now.' " Morrissey further testified that he told both his office partner, Andrea Lyon, and McNamara about the conversation later that day. According to Morrissey, when he mentioned it to McNamara, McNamara replied that he, too, had had a conversation with Judge Samuels.

Andrea Lyon, who had shared an office with Morrissey from 1981 to 1987 when she was a public defender, testified that Morrissey told her about a conversation he had had with Judge Samuels. She was not sure when Morrissey mentioned this to her, but she believed it was shortly after the mistrial was declared, and before the sentencing hearing occurred. According to Lyon, Morrissey believed that the defendant's suicide attempt might

have affected how the judge viewed the defendant. Morrissey said that Judge Samuels told him that if the defendant pleaded guilty, the judge would not impose the death sentence. As related by Lyon, Judge Samuels then said, " ' "Oops, the cat is out of the bag, I guess." ' " Lyon also testified that Morrissey talked to her by telephone after the sentencing hearing. Morrissey was upset, and he complained that the judge had reneged on his promise.

McNamara and Morrissey, according to their testimony at the post-conviction hearing, had one more meeting with Judge Samuels. McNamara testified that he and Morrissey traveled to the Markham courthouse on Friday, June 10, 1983, in anticipation of the start of the defendant's trial on the following Monday. They wanted to put the case files in the public defender's office at the courthouse. They also wanted to tell Judge Samuels that the defendant was going to stipulate to the State's evidence during the guilt phase of the proceedings and to waive a jury for sentencing. At the evidentiary hearing, they explained that they wanted to advise the judge about their plans to ensure that the judge would consider a stipulated trial tantamount to a guilty plea, so that they could be sure that the judge would adhere to his promise to impose a sentence other than death. The two defense lawyers entered the judge's chambers and found two assistant State's Attorneys there, neither of whom was involved in the defendant's case. According to McNamara's testimony at the evidentiary hearing, one of the assistants left the room while the other one remained. The two defense lawyers testified that they mentioned to Judge Samuels the defendant's intention to stipulate to the evidence and waive juries for trial and sentencing. According to McNamara, he told Judge Samuels that a stipulated bench trial is the same as a guilty plea and would take the same amount of time, and the judge

agreed. According to Morrissey, counsel told the judge of the defendant's intended waivers, and the judge nodded and said that he understood that that was what they were going to do.

Both lawyers testified that Judge Samuels did not say anything to suggest that he would fail to honor what they claim was his prior commitment. McNamara and Morrissey testified that their conversation with the judge came to an abrupt end when one of the prosecutors assigned to the case, Scott Arthur, entered the judge's chambers. According to McNamara, Arthur yelled at the judge and the defense lawyers and said that defense counsel should not be there talking to the judge. Arthur was angry, and he refused Judge Samuels' suggestion that he sit down and discuss the case with them. McNamara testified that Arthur said, " 'I'm not going to participate in any of this,' " and left the judge's chambers, followed by the other assistant State's Attorneys. According to Morrissey, Arthur accused them of talking about the case behind his back. Both McNamara and Morrissey testified that the other assistant State's Attorney followed Arthur out of the room, and that defense counsel then left also.

Trial began the next week, as scheduled, and the defendant was convicted of the two murders at the conclusion of the proceedings. A capital sentencing hearing was then held, at which Judge Samuels sentenced the defendant to death. McNamara and Morrissey acknowledged at the post-conviction evidentiary hearing that they did not then mention to the trial judge his failure to follow through on his alleged promise to impose a sentence other than death. Instead, defense counsel met the following Monday with a supervisor, Robert Isaacson, to discuss their next step. According to the testimony, they decided that it would be best not to confront Judge Samuels directly with the issue. They decided instead to refer

to the problem indirectly in the defendant's post-judgment motion, to see if that would prompt the judge to carry through with his earlier promise. The plan was not successful, however; at the hearing on the motion, the judge did not grant the defendant relief or otherwise refer to the supposed promise.

Judge Samuels also testified at the evidentiary hearing held on the post-conviction petition. He denied making any promises to defense counsel regarding what sentence he might impose on the defendant in this case. Judge Samuels said that he had an "open door" policy and that he encouraged lawyers to come in to talk with him. He testified that he probably met with one or another of the defense lawyers to discuss scheduling matters, but he asserted that he did not promise to impose a sentence other than death, or give counsel any indication of what sentence he might give the defendant. He denied telling either his court reporter, Shirley Thompson, or his court clerk, Moses Cole, to advise defense counsel that he would not sentence the defendant to death. Judge Samuels did recall meeting with defense counsel the Friday before the beginning of trial. Judge Samuels was also questioned regarding his failure to deny the allegations raised in the defendant's post-conviction petition. Judge Samuels said that he first became aware of the allegations when the defendant filed his post-conviction petition, in December 1987. He then recused himself from further proceedings in the case. He said that although he spoke with the defendant's post-conviction counsel in court or out of court several times following that, he did not deny the allegations until 1990. Judge Samuels also stated that a number of family matters occupied much of his time and attention during this period.

Judge Samuels' court reporter, Shirley Thompson, who was retired at the time of the post-conviction hearing, also testified. Thompson acknowledged that Judge

Samuels would meet alone with counsel, but she denied that the judge ever spoke to her about cases. Thompson denied that she had advised McNamara, with whom she was acquainted, about possible sentences for the defendant or had told the lawyer that Judge Samuels would not impose the death sentence if the defendant pleaded guilty or waived a jury.

Moses Cole had died before the post-conviction hearing was conducted. The parties stipulated, however, to the days when he was present at work during 1983. According to the stipulation, Cole was not at work on the day that McNamara originally believed Cole had approached the lawyer about the defendant's sentence.

At the conclusion of the evidentiary hearing, the post-conviction judge made a number of findings with respect to the trial judge's alleged promise. Reproduced below are the post-conviction judge's findings regarding this issue:

"I have had a chance to review my notes. I have taken almost three notebooks of notes here. I have reviewed the documents that have been presented. I have reviewed transcripts of prior proceedings in this matter exclusive, however, of the earlier post-conviction proceeding. Based upon the evidence as I have heard it and reviewed it and considered it, I am going to find that the evidence does not support the allegations that Judge Samuels made an improper *ex parte* communication to defense counsel suggesting to them that if the defendant waived jury on the guilt phase and waived jury on the sentencing he would be found guilty and sentenced to life. I heard Judge Samuels' testimony and that of his court reporter. And I heard the extensive attempted impeachment conducted by [defendant's post-conviction counsel], and I found Judge Samuels' testimony as he presented it at that time to be credible. However, I did still reserve judgment because I wanted to hear the other matters in this scenario. Specifically, I did hear the testimony then of Mr. McNamara and Mr. Morrissey. It is difficult in rejecting some of the things they have testified to because of the fact that they have become

successful attorneys. They have positions of great impor-
tance. They serve their clients and the public well at what
they do. But I was not dissuaded by them, but my earlie[r]
impressions of Judge Samuels in his testimony I was some-
what affected by what I perceived their attempt at *ex parte*
communication but more than that I think there were
inconsistencies in their own testimonies which led me to
reject their positions on this. And there is one thing that
has been of difficulty to me since Mr. Morrissey testified,
and that was a particular vindictiveness in his voice and in
his demeanor when he talked about Judge Samuels. Now
that could one think be attributed to the fact that maybe
Judge Samuels did snook[er] him. But I reject that. Mr.
Morrissey is an attorney. He fights battles every day. He
wins some. He loses some. He goes on to the next one. I
have not been able to determine whether this vindictive-
ness was in fact genuine on his part or he was wanting me
to believe that he still felt betrayed by Judge Samuels. But
I found it to be totally out of character that I would find
from someone in Mr. Morrissey's position. I also found it
odd and I concur with Mr. Nelson in trying to sort out this
evidence that if you believe what Morrissey and McNamara
said then apparently one would conclude that the alleged
statements made to Morrissey by Judge Samuels were gra-
tuitous without any evidence as to what any other indica-
tion as to what the evidence would be, totally something
out of character for Judge Samuels who rejected a [Su-
preme Court Rule] 402 conference because the State would
not participate in it and said hey I cannot have *ex parte*
communications. I also found it somewhat unbelievable
that Morrissey had this promise if you would call it that
and didn't immediately relay it to the chief lead attorney
in the case, even though Morrissey had more seniority than
McNamara. McNamara was the lead attorney in the
Montgomery case. Then later and it could have been the
same day. I am not sure but McNamara testifies that he
went to Judge Samuels' chambers, told him of all this evi-
dence and aggravation and mitigation and so forth and got
what he thought also was an indication that the judge
would not impose death on Mr. Montgomery. Mr. Mc-
Namara in that event is more inclined to what one would

believe he would do, met with Morrissey and told Morrissey of his good news. I somewhat find it odd that if Judge Samuels had already told Morrissey without hearing any evidence or any indication what the evidence may be that he wouldn't somehow give—McNamara has already told Morrissey and you don't have to tell me this. Some of these things just don't fit together. But McNamara testified that he told Morrissey and then Morrissey told him. Morrissey testified that he first told McNamara then McNamara told him. So there are just inconsistencies in the testimony and they do strain my ability to believe their testimony on this issue. There are also some inconsistencies as to when they told Mr. Montgomery after the sentencing as to what they thought had been an agreement with the judge or not with the judge. And just in weighing all of that type of evidence I have concluded that this indication alleged that Judge Samuels made an improper *ex parte* communication promising life or not death in exchange for waiver of the jury simply did not exist."

The parties agree that this was essentially a credibility question, and we believe that it is appropriate here to defer to the judge who presided at the defendant's post-conviction hearing, who was in a superior position to gauge the witnesses' credibility and to evaluate the sharply conflicting testimony. The defendant argues, however, that the post-conviction judge's findings were against the manifest weight of the evidence and contends that the judge erroneously discounted the corroboration provided by witnesses who testified that the lawyers had spoken to them of Judge Samuels's assurances. Foxgrover, however, was impeached with his prior convictions. Lyon was somewhat vague about when Morrissey spoke to her. In any event, the corroborating witnesses could testify only to what the defense lawyers believed they had heard from Judge Samuels. In addition, McNamara's testimony that he had spoken with Moses Cole and Shirley Thompson about the possible sentence that the judge might impose in this case was contradicted by other evidence. Here, the post-conviction court made

certain credibility determinations. We cannot say that they were against the manifest weight of the evidence.

The defendant did not testify at the post-conviction hearing, except for the purpose of waiving his continued presence at the proceeding. In an affidavit accompanying the post-conviction petition, however, the defendant stated that defense counsel did not tell him, prior to the judge's imposition of sentence, about Judge Samuels' supposed assurances regarding the sentence. Rather, defendant stated that counsel said only that Judge Samuels had never before sentenced a defendant to death in a bench proceeding, and that counsel therefore encouraged him to waive a jury for the sentencing hearing.

As the State suggested in argument at the evidentiary hearing, defense counsel might have been hoping to hear an indication from the trial judge about what sentence he would impose in this case, and counsel could have misinterpreted the judge's comments. McNamara and Morrissey testified that it was their practice not to waive a jury for a capital sentencing hearing in the absence of an indication from the trial judge that he would give a sentence other than death, and they could have believed that they had an indication from Judge Samuels about the sentence that he would impose. Other evidence showed, however, that in 22 cases defendants waived juries for sentencing hearings yet still received the death sentence, even though the policy among the public defenders was to waive a jury only when an indication had been received regarding the expected sentence in the case.

There was another reason, too, why counsel and the defendant could have believed that waiving a jury was the better course to take in this case. The defendant's suicide attempt, during jury selection, was prompted by a prospective juror's comment that the juror could decide to convict the defendant simply by looking at him. Thus,

even though the defendant had previously persisted in his intention to have the case submitted to a jury, the prospective juror's comment demonstrated the potential weakness of that strategy.

For these reasons, too, we must reject the defendant's additional contention that trial counsel rendered ineffective assistance even if they believed they had an indication from the trial judge and were mistaken in their belief. See *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) (expressing standard for ineffective assistance claims). A similar question arose in *People v. Maxwell*, 173 Ill. 2d 102 (1996). In that case, the defendant alleged in his post-conviction petition that he was denied the effective assistance of counsel because, in deciding to waive a jury for sentencing, he relied on defense counsel's statement that the judge had indicated that he would not impose the death penalty. In rejecting the defendant's argument, the court noted that on direct appeal this court addressed a similar challenge to the defendant's jury waiver and had concluded then that counsel had not rendered ineffective assistance. Notably, on direct appeal this court had found, from an examination of counsel's remarks at trial, that counsel had three distinct reasons for recommending that the defendant waive a jury:

> "First, counsel apparently believed that the judge was more likely to be lenient than a jury; counsel stated that she and her client preferred that the judge make the sentencing determination. Second, counsel wanted to preclude death-qualification of the jury for purposes of the guilt phase of the proceedings. [Citation.] Third, counsel did not want the sentencing decision to be made by a jury if its members had been exposed to, or, in counsel's words, had been 'inflamed' by, evidence of the defendant's other offenses. For these reasons, then, counsel recommended that the defendant waive a jury for the death penalty hearing.
>
> 'A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that

are alleged not to have been the result of reasonable professional judgment.' (*Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) Any one of the three grounds mentioned by counsel constitutes a valid reason for choosing to waive a sentencing jury." *People v. Maxwell*, 148 Ill. 2d 116, 143-44 (1992).

Thus, counsel's conclusion that the judge was less likely than a jury to impose the death penalty would be a legitimate ground on which to base a jury waiver.

Finally, we reject the defendant's argument that if Judge Samuels took part in any *ex parte* conversations, the defendant is entitled to a new trial and sentencing hearing. If any conversations occurred, it appears that they were limited to matters of scheduling. Though not in force when the alleged conversations took place, Canon 3 of the Code of Judicial Conduct now permits *ex parte* communications "for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits," provided that "the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the *ex parte* communication," and "the judge makes provision promptly to notify all other parties of the substance of the *ex parte* communication and allows an opportunity to respond." 155 Ill. 2d R. 63(A)(4)(a). Although there is no showing in this record whether the State received prompt notification of the supposed communications, we do not believe that a violation of the canon would warrant granting the relief the defendant now seeks. See *People v. Hicks*, 44 Ill. 2d 550 (1970); *People v. Dunigan*, 96 Ill. App. 3d 799 (1981).

## II

The defendant also contends that his two trial lawyers were ineffective for failing to investigate and present certain evidence in mitigation. At the evidentiary hearing conducted following this court's order of remand on the earlier post-conviction appeal, the defendant pre-

sented a number of witnesses who testified about additional evidence that trial counsel could have introduced during the sentencing hearing. One of the psychiatrists who had testified in the defendant's behalf at the sentencing hearing also testified at the post-conviction hearing, and he described how the additional information would have influenced his earlier assessment of the defendant. Finally, post-conviction counsel introduced expert testimony critical of trial counsel's failure to investigate, develop, and present this additional information. These witnesses—Jill Miller, a forensic social worker, and Robert Isaacson and Kevin McNally, criminal defense lawyers—believed that trial counsel should have introduced at the defendant's sentencing hearing the new evidence compiled by post-conviction counsel.

The new mitigating evidence presented at the post-conviction hearing consisted primarily of records relating to the defendant's family life before 1976. These documents consisted of the defendant's juvenile court records and of Carolyn Montgomery's mental health records. Both sets of records were available to defense counsel at the time of the defendant's sentencing hearing, in 1983, yet counsel had not obtained them.

The new evidence compiled by post-conviction counsel showed that the defendant's mother, Carolyn Montgomery, suffered from depression and alcoholism. She was hospitalized on five occasions between 1965 and 1968 following a series of suicide attempts. The evidence also showed that the defendant's parents physically attacked each other a number of times, and once his mother stabbed his father with a knife. The records further revealed that the defendant was often neglected. For example, in 1966 neighbors reported to county authorities that Carolyn was neglecting her family and that the children were not attending school regularly because they did not have adequate food and clothing.

The new material gathered by post-conviction counsel also established that while Carolyn was in the hospital in May and June of 1967, the defendant and his siblings stayed with the mother of Carolyn's boyfriend. The defendant returned to the family home after Carolyn was released from the hospital, but he soon ran away with his older brother, Douglas. The defendant and Douglas were then placed in the Audy Home, and a caseworker subsequently reported that Carolyn was doing a poor job of taking care of her children, that she drank excessively, and that she was frequently hospitalized. The defendant stayed at the Audy Home for several months, until he was released to live with relatives in Evanston. The defendant was referred to the Cook County juvenile court in August 1967, and he was then examined by a psychiatrist, Dr. Ariel David. Dr. David found the defendant to be deprived and thought that these experiences of deprivation could produce hostility and depression and possibly antisocial behavior. Dr. David recommended, unsuccessfully, that the defendant be placed outside the family residence, in a boys' home or boarding school.

The new evidence further showed that the defendant's mother was hospitalized again in April 1968 for extreme depression following a fourth attempt at suicide. She was admitted to a hospital again in September 1969 with pneumonia and chronic anxiety. Early in 1970, Carolyn Montgomery was hospitalized again for anxiety. Soon after that, the defendant's older brother, Douglas, received several referrals to juvenile court, and Carolyn told an investigator that she was sick and was not physically capable of taking care of Douglas and the other children.

According to the newly compiled evidence, later in 1970, the defendant returned to the family home. He was then 14, and all six children were sleeping in the same room. The defendant was referred to juvenile court in

May 1971 for having sexual relations with one of his half
sisters, Jean. The author of a social investigation report
concluded that the defendant needed psychiatric treat-
ment. The report also expressed the view that the pres-
ence of all six children in a single bedroom was one
circumstance explaining the defendant's sexual aggres-
sion toward his siblings. This report further noted that
Carolyn did not believe that she could supervise the de-
fendant, in light of her history of mental illness, and the
report recommended the defendant's removal from the
family home. The recommendation was not followed,
however; after an adjudication of delinquency, the defen-
dant was placed on probation and returned to the home.

In 1972 the defendant was taken from the family
home again, and he was held in the Audy Home while an
alternative placement was pursued. Late in 1973, an-
other finding of neglect was made, and the defendant
was then placed in a group home, where he remained for
more than a year. During this period, the defendant was
said to be respectful and obedient, and he attended school
regularly.

After hearing the defendant's new evidence in miti-
gation, which was documented at the evidentiary hearing
in defendant's exhibit nine, the post-conviction judge
concluded that trial counsel's failure to present this in-
formation at sentencing was not prejudicial to the defen-
dant. The judge explained:

"But we also must look at the [e]ffect or impact the evi-
dence would have had had this matter gone to sentencing
with this evidence presented to the sentencer. Dr. Porter
testified that he didn't know if he would have done
anything further had he had this evidence. He felt that he
could have had a better feeling or more. He could have
supported his position in his own mind more strongly had
he had this evidence. It really backed up what his diagno-
sis was that he could have felt better had he had this evi-
dence.

The State has pointed out in almost litany form that

much of the information contained in Exhibit Number 9 was presented at the sentencing hearing through the evidence of the family, the testimony of the family. Now, clearly there are other matters in Exhibit 9 that were not presented but much of it was.

I have heard the word corroboration. Some of these documents could have corroborated what the family was saying. I heard the word impeachment. Some of these documents may have impeached some of the things that the family and witnesses have said. I am almost [*sic*] aware that in these documents there are matters that could be considered as aggravation as opposed to mitigation. I have also considered the nature of the defendant's conduct in the murder and rape of two elderly women and have concluded that had Exhibit Number 9 been available, had it been produced by the attorneys as it has in this postconviction proceeding, that there is no reasonable probability but the result would have been any different than what it was. Mr. Montgomery still would have been sentenced to death."

The defendant argues that trial counsel rendered ineffective assistance by failing to investigate these matters more fully and by failing to introduce, at the sentencing hearing, this information about his juvenile history and his mother's mental condition. The parties agree that the applicable standard governing the resolution of this issue is found in the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To prevail on a claim of ineffective assistance under *Strickland*, a defendant must show both a deficiency in counsel's performance and prejudice resulting from that error. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Judicial scrutiny of counsel's performance is highly deferential, and a court considering a claim of ineffective assistance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. To demonstrate prejudice resulting

from an alleged deficiency in counsel's performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The parties dispute whether the post-conviction judge found that the defendant had established the first part of the *Strickland* test, a deficiency in his trial lawyers' performance. We need not resolve this question, however, for we believe that the judge's finding of a lack of prejudice is supported by the evidence and that his rejection of the defendant's ineffective-assistance argument must therefore be affirmed. Because a defendant's failure to establish either part of the *Strickland* test will defeat the claim, a court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. Accordingly, a court considering a claim of ineffective assistance "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. In the context of a capital sentencing hearing, the relevant inquiry into prejudice requires an examination of the effect of counsel's error on the sentencer's decision. *People v. Tenner*, 175 Ill. 2d 372, 384 (1997); *People v. Sanchez*, 169 Ill. 2d 472, 491 (1996); *People v. Ashford*, 168 Ill. 2d 494, 505 (1995); *People v. Coleman*, 168 Ill. 2d 509, 536 (1995). The relevant question here, then, is "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent that it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

Even if we assume that trial counsel was deficient in failing to investigate more thoroughly the defendant's juvenile and family history and in failing to present at sentencing the evidence compiled by post-conviction counsel, we do not believe that the defendant was prejudiced by counsel's performance. The evidence that the defendant now contends should have been introduced related to his life before 1976. As we have shown above, trial counsel presented evidence regarding the defendant's troubled childhood, through the testimony of the defendant's family members, including his mother. We agree with the post-conviction court that, to a large extent, the additional evidence now urged by the defendant is cumulative of information that trial counsel did introduce at the sentencing hearing.

For example, mitigation specialist Jill Miller testified at the evidentiary hearing on the post-conviction petition that the defendant had endured a chaotic and violent home: both parents were alcoholic, the father was a drug addict, the children frequently lacked sufficient food and clothing, and the children were subject to abuse. Evidence introduced by defense counsel at the sentencing hearing told much the same story, however. As we noted earlier in this opinion, the testimony at sentencing showed that the defendant's parents were alcoholics, that they fought frequently, that Carolyn Montgomery was often unable to care for her family because of her drinking, and that she was physically abusive toward the children.

Another feature of the post-conviction evidentiary hearing was testimony showing that Carolyn Montgomery did not want the defendant living in the family home, and that the family frequently moved. According to this evidence, Carolyn took the defendant to the Audy Home

on two occasions when she felt that she was unable to control him. In addition, post-conviction counsel showed that the family moved frequently from one location to another in Robbins or Evanston. Again, however, the evidence introduced by defense counsel at the sentencing hearing conveyed much the same message. That testimony showed that Carolyn often was unable to control the defendant and that she lost custody over him. The sentencing evidence also described the family's frequent moves and lack of a stable home environment. A comparison of the evidence compiled by post-conviction counsel and the evidence introduced at the sentencing hearing thus reveals that much of the newly acquired evidence is actually cumulative of information presented to the court at sentencing.

Moreover, the additional evidence that the defendant faults counsel for failing to present at the sentencing hearing focuses on the defendant's troubled youth and on his and other family members' abuse of alcohol and drugs. Evidence about a defendant's turbulent childhood is not inherently mitigating, however. *People v. Childress*, 191 Ill. 2d 168, 179 (2000); *People v. Madej*, 177 Ill. 2d 116, 140 (1997); *People v. Sanchez*, 169 Ill. 2d 472, 491-92 (1996); *People v. Ward*, 154 Ill. 2d 272, 335-37 (1992). The sentencing authority may regard that information as aggravating, particularly if the evidence suggests that the defendant might be dangerous in the future. *People v. Evans*, 186 Ill. 2d 83, 101 (1999) ("The judge could have regarded defendant's troubled life, with his criminal record, as an indicator of defendant's future dangerousness"); *People v. Henderson*, 142 Ill. 2d 258, 339 (1990) ("[E]vidence of an upbringing that has caused a defendant to become violent and aggressive can be considered in aggravation, for one duty a sentencer has is to predict a defendant's future behavior based on his past behavior"). In this case, the sentencing judge could

have viewed the testimony about the defendant's chaotic home as aggravating.

For similar reasons, testimony about a defendant's history of alcohol and drug abuse is not necessarily mitigating. Although a defendant might urge this evidence in mitigation, as an explanation for his misconduct, the sentencer is not required to share the defendant's assessment of the information. *People v. Madej*, 177 Ill. 2d 116, 138-39 (1997). In *People v. Shatner*, 174 Ill. 2d 133 (1996), this court rejected the argument that the sentencing judge erred in failing to attribute offenses committed by the defendant to his use of drugs. The court explained:

> "Underlying this premise is that since drugs are partly to blame for his actions, the defendant is somehow less culpable and should not suffer the ultimate penalty for his criminal behavior. Simply stated, the sentencing judge was under no legal obligation to subscribe to this suggestion. To the contrary, the sentencing judge was free to conclude, under the circumstances, that defendant's drug history simply had no mitigating value but was, in fact, aggravating." *Shatner*, 174 Ill. 2d at 160.

Thus, the sentencing judge in this case was not required to accept as mitigating the defendant's evidence of his and his parents' substantial problems with alcohol.

In determining the potentially prejudicial effect of counsel's failure to investigate and present specific testimony or documentation, our analysis must focus "on the totality of the evidence," and not just on the newly proffered mitigation. *People v. Coleman*, 168 Ill. 2d 509, 538 (1995). Consideration of the aggravating nature of the defendant's offenses is appropriate in assessing what effect the omitted evidence might have had on the sentencing determination. See *People v. Richardson*, 189 Ill. 2d 401, 416-17 (2000). In view of the offenses in this case and the mitigating evidence actually presented at the defendant's sentencing hearing, we do not believe that the defendant has succeeded in demonstrating that he was prejudiced as a consequence of trial counsel's fail-

ure to investigate and present the new information he now raises. The defendant's offenses were particularly brutal, involving the rape and murder of two women in their own home.

As we have noted, trial counsel presented similar evidence about the defendant's troubled and alcohol-ridden background, so we do not have in this case a complete failure on the part of counsel to investigate and present evidence regarding the defendant's personal history. We believe that the evidence actually introduced by defense counsel at the sentencing hearing serves to distinguish the present case from those in which this court has found prejudice resulting from counsel's failure to investigate and introduce evidence about a defendant's personal history and family background. In *People v. Morgan*, 187 Ill. 2d 500 (1999), defense counsel presented only two witnesses in mitigation, and their testimony filled only 10 pages of the record. In addition, counsel had notice of brain damage incurred by the defendant as a child, yet counsel made no investigation into the defendant's mental condition. Counsel also failed to make any inquiry into the defendant's family background, which contained a history of abuse and other violence. In *People v. Perez*, 148 Ill. 2d 168 (1992), the only evidence introduced in mitigation was a report prepared by a psychologist for the Department of Corrections; the report described the defendant as dangerous and a likely repeat offender. Counsel made no investigation of the defendant's personal or family history and even failed to present mitigating evidence that he had access to. Unlike trial counsel in *Morgan* and *Perez*, trial counsel in the present case compiled and introduced a body of mitigating evidence regarding the defendant's personal history and background. On this record, we cannot say that the post-conviction judge's determination of the issue was manifestly erroneous.

Opposing this result, the defendant raises several arguments in support of his contention that trial counsel's failure to discover and present this evidence was prejudicial. The defendant first argues that the additional testimony would have contradicted a number of the trial judge's remarks at the sentencing hearing. The defendant cites the following comments made by the judge in imposing sentence:

> "I don't know that the defendant's family has been the worst family. He has been fortunate to have not only his mother, his brother and sister, but his aunts and I sympathize with his good family.
>
> As it was said a wise child is blessing to his father, but a foolish child is a burden to his mother.
>
> The family has had some of its problems. I don't suppose they are the only family that have problems on occasion, but it is not as if the defendant was kicked out on the street at the age of seven and left to shift for himself.
>
> So it isn't as if nobody tried to help him. A lot of people tried to help him.
>
> My heart does go out to his good mother."

The defendant contends that introduction of the additional evidence compiled by post-conviction counsel would have contradicted the trial judge's comments and would have precluded the judge from making those findings regarding the defendant and his family.

Unlike the defendant, we do not believe that the comments quoted above are entirely inconsistent with the new evidence in mitigation presented at the post-conviction hearing. The judge's positive references to the defendant's siblings and aunts were supported by the evidence—both the evidence introduced at sentencing, and the new evidence gathered by post-conviction counsel. When the defendant's mother proved to be unable to take care of the children, help was offered by the extended family. The judge's favorable comments about the defendant's mother may simply reflect on Carolyn Montgomery's earlier decision to quit drinking, as she

testified at the sentencing hearing she had done, and on her frank acknowledgment of the terrible toll her alcoholism had taken on the family. In her own way, she was at least as deserving of the judge's sympathy as the defendant insists he was.

Moreover, we believe that the defendant's argument overstates the significance of the comments quoted above. The judge made these remarks at the beginning of his announcement of the defendant's sentence, and we do not consider the comments quoted above to have been central to the judge's decision. Nor do we believe that there is a reasonable probability that introduction of the new evidence assembled by post-conviction counsel would have led the judge to impose a sentence other than death. As we have already noted, the offenses involved here were particularly brutal, involving the murders and rapes of two women in their home; much of the new information cited by the defendant is cumulative of evidence presented at the sentencing hearing and may actually be viewed as aggravating. To prevail on a claim of ineffective assistance, a defendant must show a reasonable probability that the outcome of the proceeding would have been different—in this context, that a sentence of death would not have been imposed. The additional evidence that the defendant contends should have been presented at sentencing might have removed some of the shadows from the defendant's personal history, but the light cast by this information would not likely have led the trial judge to impose a different sentence.

As a further ground in opposition to the post-conviction judge's finding of no prejudice, the defendant argues that the failure to investigate and present records of the defendant's juvenile history and Carolyn Montgomery's medical history was fatal to the mitigation strategy pursued at the sentencing hearing by trial counsel. The defendant characterizes the defense strat-

egy as being based on testimony, from family members and Carolyn Montgomery, that Carolyn was a bad mother, and on Carolyn's further testimony in which she pleaded in support of her son's life. The defendant maintains that the "central weakness" in this strategy was the inconsistent role played by Carolyn Montgomery: in the defendant's phrasing, she was both the villain of the defendant's childhood and the vehicle through which sympathy for the defendant's plight would be invoked. The defendant contends that counsel's failure at sentencing to present the new evidence raised in the postconviction proceedings deprived the defense strategy of corroboration that would have been crucial to that strategy's success.

We have carefully reviewed the testimony presented at the defendant's sentencing hearing, and we do not believe that there is a reasonable probability that introduction of the new evidence cited by the defendant would have altered the outcome of the earlier proceeding. The defense strategy at sentencing did not require Carolyn to assume inconsistent roles in her testimony. Carolyn spoke freely of her own history of alcoholism and acknowledged the problems it had caused her family. She also said that she had not been drinking for the last seven years, and thus she was able to speak from a perspective that enhanced her credibility and made her more sympathetic. Nor did Carolyn shoulder the entire weight of the defense strategy: the defendant's siblings and aunts also testified, presenting a consistent description of the defendant's disordered childhood and chaotic home environment, and those witnesses also spoke in favor of sparing the defendant's life. Finally, as we have previously noted, the evidence the defendant now urges is not inherently mitigating; a sentencer could find it either aggravating or mitigating, depending on how it viewed the information.

As additional proof of prejudice arising from trial

counsel's failure to present at sentencing the new evidence gathered by post-conviction counsel, the defendant points to the testimony given by Dr. Stephen Porter at the post-conviction evidentiary hearing. Dr. Porter had testified in the defendant's behalf at the sentencing hearing, describing then the defendant's history of alcohol and drug abuse and expressing the view that the defendant was acting under the influence of an extreme mental or emotional disturbance at the time of the offenses. Dr. Porter subsequently reviewed the new evidence compiled by post-conviction counsel. At the evidentiary hearing on the post-conviction petition, Dr. Porter stated that the new information would have assisted him in formulating his earlier assessment of the defendant. Dr. Porter said that the evidence would have given him a better understanding of the extent of the abuse and deprivation the defendant experienced as a child, and that it would have given him a better understanding of the origins of the defendant's substance abuse problems. With regard to the latter point, Dr. Porter said that he could have traced the defendant's substance abuse problems to chronic depression that commenced when the defendant was a youth. As Dr. Porter explained at the evidentiary hearing, the defendant's heavy consumption of alcohol and drugs seemed to be the defendant's way of self-medicating.

We do not believe that Dr. Porter's testimony at the post-conviction hearing establishes that the defendant was prejudiced by trial counsel's failure to collect this additional information. Dr. Porter stated that if he had had this information at the time of sentencing, he could have been more confident about his conclusions, and he could have provided a more detailed depiction of the defendant's background and mental functioning. Thus, even with the new evidence, it appears that the central thrust of Dr. Porter's evaluation of the defendant would have

remained the same. Given the nature of the testimony in mitigation and the brutality of the defendant's offenses, we do not believe that there is a reasonable probability that the outcome of the sentencing hearing would have been different, even if Dr. Porter had then been armed with the new information compiled by post-conviction counsel.

Finally, the defendant cites certain expert testimony introduced at the evidentiary hearing on the defendant's post-conviction petition. These witnesses—Jill Miller, Robert Isaacson, and Kevin McNally—found the new evidence compiled by post-conviction counsel to be compelling, and they believed that trial counsel's failure to introduce this material at the sentencing hearing was prejudicial to the defendant. The post-conviction judge heard the same evidence, however, and his conclusion is not manifestly erroneous. See *People v. Coleman*, 183 Ill. 2d 366, 384-85 (1998). In sum, we do not believe that the defendant was prejudiced, under *Strickland*, as a result of defense counsel's failure to investigate and present the evidence now cited by the defendant.

### III

The defendant also briefly raises several other contentions before this court, and we now turn to these issues. The defendant argues that the post-conviction judge erred in dismissing, without an evidentiary hearing, a number of other post-conviction claims; these are identified as counts IV through VI, VIII through X, XII, and XXXII, and all of them allege the ineffective assistance of trial or appellate counsel.

Counts IV, V, VI, and VIII all involve the trial judge's alleged promise to impose a sentence other than death if the defendant pleaded guilty to the charges against him and waived a jury for sentencing. Count IV alleges that trial counsel's reliance on the judge's promise caused a breakdown in the adversary process; count V alleges that

counsel erroneously urged the defendant to waive juries for trial and sentencing because of the judge's promise; count VI alleges that counsel failed to ensure that the defendant was competent to waive his rights to a jury; count VIII alleges that trial counsel's reliance on the judge's promise caused counsel to fail to represent the defendant vigorously. A psychiatric examination of the defendant after his suicide attempt found him to be fit, however. In addition, the proceedings at trial show that the defendant made knowing, intelligent, and voluntary waivers of juries, both before trial and before sentencing. The trial judge admonished the defendant of his rights, and the defendant agreed to give them up. Also, the record shows that the defendant knowingly, intelligently, and voluntarily agreed to the submission of the case to the trial judge through a stipulated bench trial. On each occasion, the defendant denied that he had been promised anything in exchange.

The defendant also mentions that he told defense counsel prior to the beginning of trial that he wished to retract his jury waiver, and that counsel replied that it was too late to do so. The defendant observes that the decision to allow a defendant to withdraw a jury waiver is within the trial judge's discretion (*People v. Hall*, 114 Ill. 2d 376, 414 (1986)), and that counsel therefore misunderstood the applicable law. We do not agree that trial counsel misunderstood the law. The statement attributed to counsel demonstrates nothing more than counsel's realization that the trial was about to begin and that the defense strategy had already been developed in reliance on the defendant's decision to waive a jury.

Counts IX and X allege that appellate counsel rendered ineffective assistance because they did not raise two challenges to the constitutionality of the death penalty in Illinois on two specified grounds, that the death penalty statute is unconstitutionally vague and

that a defendant sentenced to death may be denied equal access to post-conviction relief. The defendant does not support these points with any argument in his brief, however, and therefore they may be considered waived. Moreover, we note that appellate counsel did raise on direct appeal a number of challenges to the constitutionality of the death penalty, which this court rejected. *People v. Montgomery*, 112 Ill. 2d 517, 531-32 (1986).

In count XII the defendant alleges that appellate counsel rendered ineffective assistance because he failed to contest the defendant's waiver of the juries and agreement to a stipulated bench trial. We have rejected similar challenges to trial counsel's performance, however, and the same result should obtain with respect to appellate counsel. Finally, for count XXXII, the defendant alleges that appellate counsel was ineffective in failing to create a record and raise on direct appeal the issues regarding the trial judge's alleged promise to not impose the death sentence. The evidence presented at the evidentiary hearing showed, however, that trial and appellate counsel agreed that the better course would be to raise the issue in a post-conviction petition rather than on appeal from the conviction and sentence. As a strategic choice made by counsel after thorough discussion, this decision is "virtually unchallengeable." *Strickland v. Washington*, 466 U.S. 668, 690, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066 (1984).

\* \* \*

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Thursday, November 16, 2000, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1998). The clerk of this court shall send a certified copy of the

mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

McNamara and Morrissey, Montgomery's attorneys, are, by all accounts, respected and able members of the bar. There is no basis in the record for suggesting that they would manufacture testimony against Judge Samuels. Judge Samuels, on the other hand, had very compelling reasons for reneging on his promise to McNamara and Morrissey and then disavowing that a promise had been made. Having been caught by the assistant State's Attorneys engaging in *ex parte* communications with McNamara and Morrissey, Judge Samuels may have believed that imposition of the death penalty and denial of impropriety were his best defense against investigation by the Judicial Inquiry Board.

The Code of Judicial Conduct provides that "[a] judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." 155 Ill. 2d R. 62(A). The Code further provides that "[a] judge shall not initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding." 155 Ill. 2d R. 63(A)(4).

A trial judge has an obligation to assure the public that justice is administered fairly because the appearance of bias or prejudice can be as damaging to public confidence as would be the actual presence of bias or prejudice. *People v. Bradshaw*, 171 Ill. App. 3d 971, 975-76 (1988). The situation before us provides a useful illustration of this. Regardless of what was actually said

or done in Judge Samuels' chambers, the circumstances of the conversations have left an indelible taint on the proceedings. The integrity of the process has been fatally compromised. In a normal case, this would require that we vacate the judgment and remand the matter for a new trial. See, *e.g.*, *In re Wheatley*, 297 Ill. App. 3d 854 (1998); *People v. Sumner*, 40 Ill. App. 3d 832 (1976). I fail to see how we can order anything less where, as here, a man's life hangs in the balance.

On retrial, the State should not be permitted to seek the death penalty against Montgomery. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). It is therefore void and unenforceable.

JUSTICE McMORROW, also dissenting:

I join in the dissenting opinion of Chief Justice Harrison, except for the final paragraph, in which he discusses his partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998). I agree with Chief Justice Harrison that the circumstances of the *ex parte* conversations in this case require that defendant's conviction and sentence be reversed. *Cf. People v. Bradshaw*, 171 Ill. App. 3d 971, 976-77 (1988). In my view, this cause should be remanded to the circuit court for a new trial and unrestricted sentencing hearing.