Docket No. 87286–Agenda 5–March 2001.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ARTHUR DALE HICKEY, Appellant.

Opinion filed September 27, 2001.

JUSTICE THOMAS delivered the opinion of the court:

Defendant, Arthur Dale Hickey, appeals an order of the circuit court of Will County dismissing his amended post-conviction petition without an evidentiary hearing and denying defendant’s requests to review and to test certain evidence. Because defendant was sentenced to death for his underlying murder conviction, his appeal lies directly with this court. See 134 Ill. 2d R. 651(a). For the reasons that follow, we affirm the trial court’s orders.

BACKGROUND

This court has previously set forth the evidence presented at defendant’s trial in our opinion on defendant’s direct appeal. See 
People v. Hickey
, 178 Ill. 2d 256 (1997). Therefore, we discuss only those facts and evidence necessary to the disposition of this appeal. Defendant’s convictions arose from the murder of Jeff Stephens and the sexual assault and attempted murder of Jeff’s wife, Heather, on November 25, 1991. That morning, Jeff got up between 5 and 5:30 a.m. to go to work. He went downstairs to take the garbage out to the end of the driveway for pickup. Shortly thereafter, Heather heard yelling outside the house, followed by a gunshot. Heather got up and began putting on her bathrobe. As she was putting on her bathrobe, a man wearing a ski mask and holding a gun came into the bedroom, forced Heather onto the bed and tied her wrists to the bedposts. The man sexually assaulted Heather, then later shot her in the side of her face. Heather said that she tried not to look at her assailant while he was assaulting her because she was frightened.

Heather was never able to identify anyone as her attacker, although she initially told the police that her attacker was in his 20s, was between 5 feet and 5 feet, 4 inches tall, weighed 130 pounds, had medium length, stringy blond hair and no facial hair. At the time, defendant was 40 years old, 5 feet 6 inches tall, weighed 180 to 190 pounds, had a full mustache, and dark hair on his head with some grey in it. A composite sketch of the perpetrator was prepared based upon Heather’s description. The officer that prepared the composite sketch testified that Heather was in a great deal of pain and was being treated for a gunshot wound at the time that she gave the description.

Heather viewed numerous photo lineups and mug shots following the assault, but never was able to identify her assailant. Defendant’s photo was included in some of the photo lineups shown to Heather. Although Heather told the officer she thought she would be able to identify the perpetrator if she saw him, she also testified at trial that she was not certain of the man’s hair color and was not certain whether he had facial hair. She explained that is was dark in the bedroom, she was under stress, and she was not wearing her glasses. Without her glasses, Heather could see up close but not far away.

Heather was taken to Riverside Medical Center in Kankakee, Illinois. A registered nurse collected samples from Heather for a rape kit, including vaginal smears on slides and swabs. The nurse also collected additional vaginal and rectal swabs. The samples, as well as Heather’s underwear and Jeff’s sweatshirt, were sent to the Illinois State Police’s Joliet, Illinois, crime lab. The rape kit and Heather’s underwear then were sent to the State Police’s Metro East crime lab. There, blood and semen were detected on Heather’s underwear, and semen was detected on certain vaginal and rectal swabs. After the samples from the rape kit and Heather’s underwear tested positive for the presence of semen, they were sent to the State Police crime lab in Springfield, Illinois, for DNA testing.

David Metzger, a forensic scientist employed by the Springfield crime lab in the DNA unit extracted DNA from the evidence received, including a blood sample from Heather, a vaginal swab, a swatch from Heather’s underwear, a rectal swab and swatch from Jeff Stephens’ sweatshirt. During his testing of the DNA, however, Metzger mistakenly exposed the DNA evidence too long to restriction enzyme, which damaged the DNA extractions to the point where they no longer were useable.

Metzger then requested additional samples and obtained Heather’s underwear and the additional swabs containing semen. Metzger extracted DNA from the samples and produced four developed autoradiograms, or autorads, which indicated that the suspect DNA was inconsistent with Jeff Stephens’ DNA. The suspect DNA could not be matched with anyone involved in the case at the time.

However, in April 1993, while defendant was incarcerated for the criminal sexual assault of his stepdaughter, a preliminary correlation was made between defendant’s DNA and the DNA of the perpetrator in the Stephens case by State Police indexing personnel. Accordingly, blood samples were obtained from defendant pursuant to a search warrant and were sent to Metzger. Metzger ran a series of autorads with defendant’s DNA. He then ran a series of autorads on defendant’s DNA and the DNA from the suspect in the Stephens case, producing nine autorads. All nine autorads showed a match between defendant’s DNA and that of the perpetrator in the Stephens case. The frequency of such a match was 1 in 15 billion people.

Thereafter, defendant was charged with the crimes. Following a jury trial, defendant was convicted of first degree murder, attempted first degree murder, aggravated battery with a firearm, aggravated criminal sexual assault and home invasion. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty and found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. Accordingly, defendant was sentenced to death for the murder and was sentenced to concurrent prison terms of 60 years for the remaining offenses. On direct appeal, this court affirmed defendant’s convictions and sentences. 
People v. Hickey
, 178 Ill. 2d 256 (1997). The United States Supreme Court denied defendant’s petition for writ of 
certiorari
. 
Hickey v. Illinois
, 524 U.S. 955, 141 L. Ed. 2d 742, 118 S. Ct. 2375 (1998).

Defendant then filed a 
pro se
 petition for post-conviction relief and a motion for appointment of counsel. After counsel was appointed, defendant’s attorneys filed a motion to preserve DNA evidence, which was granted. Defense counsel also served subpoenas on the Will County sheriff and the State Police. Counsel filed an amended petition for post-conviction relief and filed a motion to produce DNA evidence. The State filed a motion to dismiss the amended post-conviction petition on the ground that the matters raised therein either were matters of record or did not raise issues of constitutional magnitude. Defendant then filed a second amended post-conviction petition. The trial court denied defendant’s discovery motion, quashed his subpoenas, and dismissed his second amended post-conviction petition without an evidentiary hearing. The trial court later denied defendant’s motion to reconsider. The instant appeal followed. 134 Ill. 2d R. 651(a).

ANALYSIS

The Post-Conviction Hearing Act (725 ILCS 5/122–1 through 122–7 (West 1998)) provides a defendant with a means through which he can challenge his conviction or sentence for violations of federal or state constitutional rights. 
People v. Tenner
, 175 Ill. 2d 372, 377 (1997). An action seeking post-conviction relief is a collateral proceeding and not an appeal from the earlier judgment. 
People v. Williams
, 186 Ill. 2d 55, 62 (1999). To be entitled to post-conviction relief, a defendant must demonstrate a substantial deprivation of federal or state constitutional rights in the proceedings that produced the challenged conviction or sentence. 
People v. Morgan
, 187 Ill. 2d 500, 528 (1999). The scope of post-conviction relief is limited, through considerations of waiver and 
res judicata
, “to constitutional matters which have not been, and could not have been, previously adjudicated.” 
People v. Winsett
, 153 Ill. 2d 335, 346 (1992). Accordingly, issues that a defendant raised in his appeal of the underlying judgment of conviction, or issues that could have been raised but were not, generally will not be considered in a post-conviction proceeding. 
People v. West
, 187 Ill. 2d 418, 425 (1999).

A defendant is not entitled to an evidentiary hearing on his post-conviction petition as a matter of right. 
People v. Whitehead
, 169 Ill. 2d 355, 370-71 (1996). An evidentiary hearing on a post-conviction petition is warranted only where the allegations of the post-conviction petition, supported by the trial record or accompanying affidavits where appropriate, make a substantial showing that a defendant’s constitutional rights have been violated. 
Morgan
, 187 Ill. 2d at 528. All well-pleaded facts in the petition and accompanying affidavits, if any, are taken as true for the purpose of determining whether to grant an evidentiary hearing. 
People v. Brisbon
, 164 Ill. 2d 236, 244-45 (1995). This court reviews a circuit court’s determination regarding the sufficiency of allegations in a post-conviction petition 
de novo
. 
People v. Coleman
, 183 Ill. 2d 366, 388-89 (1998).

At the outset, we observe that with regard to each issue raised by defendant, the State maintains that defendant has waived that issue because he did not raise the issue on direct appeal, nor does he now claim that his appellate counsel was ineffective for failing to raise those issues on direct appeal. Although any issue that could have been presented on direct appeal but was not is deemed waived, the doctrine of waiver will be relaxed where fundamental fairness so requires, where the facts relating to the claim do not appear on the face of the original appellate record, or where the alleged waiver stems from the incompetence of appellate counsel. 
People v. Hobley
, 182 Ill. 2d 404, 428 (1998). Upon review of the pleadings and record in this case, we agree with the State that defendant has waived the issues raised on appeal because those issues could have been raised in his direct appeal. However, because defendant makes the claim that due to the trial court’s rulings, his post-conviction counsel could not determine whether defendant’s trial and appellate counsel were ineffective, we will examine those issues under principles of fundamental fairness.

I. Discovery

Defendant first contends that he was denied due process of law when the trial court denied his production requests and quashed his subpoenas. Defendant argues that the trial court’s ruling denied him a chance to investigate and present his post-conviction claims, such that his post-conviction counsel could not certify in good faith that they had performed the duties imposed upon them by Illinois Supreme Court Rule 651(c) (134 Ill. 2d R. 651(c)).

Defendant had filed a motion to produce DNA evidence requesting the vaginal swab which formed the basis of comparison to defendant’s DNA sample. Defendant also sought items of evidence recovered in the case which had not been tested, including vaginal smears on slides from the rape kit, Heather’s blood sample, a Kool cigarette butt, and Heather’s robe and terrycloth gown. Defendant later amended his motion to produce DNA evidence to request a sample of his blood taken in connection with his arrest for the sexual assault of his stepdaughter. Defendant also served a subpoena 
duces tecum
 on the Will County sheriff seeking evidence logs which would show the chain of custody of the DNA evidence and of defendant’s blood sample. In addition, defendant served a subpoena 
duces tecum
 to the State Police seeking David Metzger’s complete personnel file. The circuit court denied defendant’s discovery requests and quashed the subpoenas to the Will County sheriff and the State Police.

Defendant contends that the trial court committed reversible error in violation of his constitutional rights when it quashed his subpoenas and denied his discovery requests. Defendant claims that based upon Heather Stephens’ description of the perpetrator, as well as the composite sketch prepared based upon Heather’s description, he cannot be the offender in this case. Defendant argues that the DNA evidence in this case, which was critical to his conviction, is suspect in light of Metzger’s destruction of the first samples and Metzger’s “fortuitous” discovery of additional samples. Defendant also questions the State’s failure to test all the evidence in this case, including Heather’s robe and a Kool cigarette butt. Defendant notes that Heather had initially told police investigators that the perpetrator had ejaculated onto her robe, although at trial she testified that although she first thought the perpetrator did not ejaculate inside her, when she went to the bathroom later, she saw what looked like sperm coming from her vagina. Defendant also notes that neither Heather nor Jeff were smokers, and defendant smoked only Camel cigarettes.

In addition, defendant claims he should have been permitted to investigate Metzger’s background in light of Metzger’s destruction of the first samples in this case and the fact that Metzger had been disciplined by the State Police shortly before he testified in this case. Finally, defendant claims that his post-conviction counsel had a duty to investigate the possibility of tampering with regard to his blood sample. Defendant states that the Will County sheriff had taken two samples of his blood in connection with the sexual assault of his stepdaughter, and suggests that the Will County sheriff may have substituted those samples with that of the offender in the Stephens case. Defendant argues that his production requests were proper given that the State has the exclusive control and custody of unexamined items of crime scene evidence.

Although neither the civil nor criminal discovery rules apply to post-conviction proceedings, a circuit court nonetheless has inherent discretionary authority to order discovery in post-conviction proceedings. 
People v. Fair
, 193 Ill. 2d 256, 264 (2000). However, because post-conviction proceedings afford a defendant only limited review, and because there is an opportunity for abuse of discovery, a circuit court must be cautious in the exercise of its authority to order discovery. 
People v. Enis
, 194 Ill. 2d 361, 415 (2000). A circuit court, then, should allow discovery only if the moving party has demonstrated “good cause” for the discovery request. 
Fair
, 193 Ill. 2d at 264-65. Consequently, this court has upheld a circuit court’s denial of a defendant’s discovery request where that request went beyond the limited scope of post-conviction proceedings and amounted to, in essence, a “fishing expedition.” 
Enis
, 194 Ill. 2d at 415. A circuit court’s denial of a request for discovery in a postconviction proceeding will not be reversed absent an abuse of discretion. 
Fair
, 193 Ill. 2d at 265.

Upon review, we find that the circuit court did not abuse its discretion in denying defendant’s discovery requests. Although defendant claims that his discovery requests were narrow and circumspect, we find that the requests amounted to nothing more than a fishing expedition. Post-conviction proceedings are limited to considerations of constitutional matters which have not been, and could not have been, previously adjudicated. 
People v. Winsett
, 153 Ill. 2d 335, 346 (1992). Here, the evidence requested by defendant was known to exist at the time of trial, and the questions regarding the evidence raised by defendant in support of his discovery requests were all raised at defendant’s trial.

For example, police officers testified and were cross-examined concerning the chain of custody of the evidence in the case, as well as the chain of custody regarding the samples taken from defendant. With regard to the testing of evidence, an employee of the State Police crime lab testified that the State Police works on a deferred examination system with regard to evidence, meaning that when there is a lot of evidence in a case, the crime lab examines the best evidence first, then tests additional evidence if further testing is needed. In addition, Metzger testified and was cross-examined concerning his destruction of the first samples in this case, as well as his testing of the additional samples. Defendant’s two expert witnesses criticized Metzger’s testing of the DNA samples, including his destruction of the first samples. Defendant’s experts also testified that Metzger’s results matching defendant’s DNA to that of the perpetrator in the Stephens case were not reliable.

Defendant, however, denies that the discovery requests were a fishing expedition, and argues that the discovery was necessary in order for his post-conviction counsel to determine whether defendant’s trial counsel and appellate counsel were ineffective. Likewise, defendant argues that his post-conviction counsel could not certify that they had made the necessary amendments to defendant’s 
pro se
 post-conviction petition without the requested discovery. This, however, is exactly the sort of fishing expedition that is not permitted in post-conviction proceedings.

In support of his claim, defendant cites this court’s recent decision in 
Fair
. In 
Fair
, the defendant was convicted of two murders and was sentenced to death. 
Fair
, 193 Ill. 2d at 259. Following the defendant’s conviction, it was discovered that the judge who had presided over the defendant’s trial and sentencing had engaged in extensive criminal conduct and corruption during the time before and after the defendant’s trial. 
Fair
, 193 Ill. 2d at 260. This court held that the defendant was entitled to discovery of evidence obtained by the Cook County State’s Attorney during the investigation of the trial judge in order to establish a nexus between the judge’s criminal conduct and the defendant’s trial. 
Fair
, 193 Ill. 2d at 267. We noted that because the trial judge had pled guilty, all the evidence concerning the judge’s criminal conduct was in the exclusive control of the State, and it would be virtually impossible for the defendant to establish a nexus between the judge’s criminal conduct and the defendant’s trial without access to that evidence. 
Fair
, 193 Ill. 2d at 266.

We find this case to be distinguishable from our decision in 
Fair
. As noted, the fact of the judge’s corruption in 
Fair
 was not discovered until some time after defendant had been convicted and sentenced. Here, in contrast, all evidence sought by defendant in his motion for DNA evidence and in his subpoenas was available at the time of his trial. Defendant’s subpoenas and discovery requests, then, went well beyond the limited scope of a post-conviction proceeding and, therefore, were properly denied.

Defendant also claims that the trial court’s decision in this case was “contrary to the spirit, if not the letter, of” an order this court entered in People v. Enoch, Nos. 59390, 70254, 83298 cons. (November 17, 1998). In the order, this court allowed the defendant’s motion for stay of execution and remanded the cause to the circuit court. In addition, the State was ordered to produce the underlying data for DNA testing in the case and to provide access to evidentiary material for independent testing.

In defendant’s motion for reconsideration, he attached the relevant pleadings from the Enoch case to establish the similarities between that case and his case. We have reviewed the pleadings in that case and disagree with defendant that his case is similar. In Enoch’s case, DNA technology was not available, and thus was not done, at the time of defendant’s trial. In addition, in late 1996, defense counsel noted that a critical piece of evidence used against the defendant at his 1983 trial, a bloodstained and sweat-stained shirt, was missing a swatch of fabric from the underarm. The State admitted that the swatch had been taken from the shirt before the defendant’s 1983 trial, but denied the defendant’s request to perform DNA tests on the sweat stains. The defendant’s counsel had argued that the swatch of fabric constituted newly discovered evidence supporting a claim of actual innocence.

Here, in contrast to the Enoch case, DNA testing was performed on the evidence at issue in defendant’s trial. Further, the evidence requested by defendant in his motion to produce, in contrast to the evidence at issue in People v. Enoch, was known to exist at the time of defendant’s trial. Consequently, the trial court in this case did not violate the spirit of this court’s order in People v. Enoch when it denied defendant’s discovery request.

We note, however, that defendant suggests that the trial court committed reversible error because it did not allow defense counsel to investigate defendant’s claim that he is actually innocent. Claims of actual innocence under the Post-Conviction Hearing Act require that the supporting evidence be “new, material, noncumulative and, most importantly, ‘ “of such conclusive character” ’ as would ‘ “probably change the result on retrial”.’ “ 
People v. Washington
, 171 Ill. 2d 475, 489 (1996), quoting 
People v. Silagy
, 116 Ill. 2d 357, 368 (1987), quoting 
People v. Molstad
, 101 Ill. 2d 128, 134 (1984). Thus, in 
Washington
, this court found that the defendant’s claim of newly discovered evidence could be raised in the defendant’s post-conviction petition to entitle the defendant to a new trial. 
Washington
, 171 Ill. 2d 475. The newly discovered evidence was the affidavit of a woman who testified that she had been present when her then boyfriend and a friend had shot the victim and had fled to Mississippi for six years following the murder. 
Washington
, 171 Ill. 2d at 477.

Although defendant in this case alleges that the evidence requested in his discovery motions and subpoenas may go to a claim of actual innocence, we note that none of the material sought was new, material and noncumulative. Nor can we say that the materials sought were of such conclusive character that it likely would change the result upon retrial. Even though defendant suggests problems with contamination of the second sample sent to Metzger and suggests tampering with his blood sample, he offers no evidence in support of these claims. Nor does defendant establish how questions concerning Metzger’s methods and qualifications would change the result upon retrial. As noted, two expert witnesses testified at trial on behalf of defendant criticizing Metzger’s methodology, qualifications and conclusions. Because defendant has failed to show that his discovery requests were necessary for the litigation of constitutional claims that were not presented in the original proceedings, the trial court properly denied those requests.

II. Testimony of Prosecution DNA Expert

Defendant next contends that his amended petition for post-conviction relief raised numerous 
Brady
 violations with regard to the testimony of David Metzger, the State’s DNA expert witness. Defendant claims that the prosecution violated 
Brady
 where it: (1) permitted Metzger to testify falsely concerning his qualifications; (2) suppressed evidence that Metzger had been reprimanded in the past for sloppy or unprofessional work; and (3) suppressed Metzger’s written statement to the Will County sheriff explaining how he had destroyed the first DNA samples. These claims arise from information contained within Metzger’s personnel file. Prior to Metzger’s testimony, defendant had moved for the disclosure of Metzger’s personnel file. The trial court reviewed Metzger’s personnel file 
in camera
, but stated that it found no impeaching information that required the file to be turned over to the defense. The trial court stated, however, that it would impound the file and include it in the record.

Included within Metzger’s personnel file was information regarding a disciplinary incident. Metzger had been charged by the State Police with stealing a microscope in January 1995. In May 1995, Metzger entered into a settlement agreement with the State Police, which provided that Metzger would receive a 100-day suspension without pay, would perform 120 hours of community service, would forfeit his accrued vacation time, and during the period of his suspension, would contact the research and development program coordinator each day by telephone and would not access work facilities without an escort. Shortly after he had returned to work following his suspension, Metzger testified in this case.

In 
Brady v. Maryland
, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), the United States Supreme Court set forth the government’s affirmative duty to disclose evidence favorable to a defendant. The general rule, as set forth in 
Brady
, provides that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” 
Brady
, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. A defendant is not entitled to relief under 
Brady
 unless he can establish that the evidence improperly withheld was both favorable to the defense and material.

In this context, favorable evidence is material “only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” 
United States v. Bagley
, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985). A reasonable probability that the result of the proceeding would have been different is a “probability sufficient to undermine confidence in the outcome.” 
Bagley
, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383.

With regard to defendant’s claim that Metzger testified falsely, defendant claims that the materiality element of 
Brady
 is met where the prosecution’s case included perjured testimony. Specifically, defendant contends that Metzger committed perjury when he testified that he was a DNA research coordinator and had held that title for the previous five years, and when he testified that he had been continuously employed by the State Police for the previous 14 years. Defendant alleges that Metzger must have been demoted to the position of DNA research coordinator, because the personnel file showed that Metzger had held more senior positions, including forensic science administrator and public service administrator, shortly before he testified. In addition, defendant argues that Metzger had not been continuously employed by the State Police for the previous 14 years because he had just returned to work following a 100-day suspension.

It is well established that the State’s knowing use of perjured testimony in order to obtain a criminal conviction constitutes a violation of due process of law. 
People v. Olinger
, 176 Ill. 2d 326, 345 (1997). If there is any reasonable likelihood that the false testimony could have affected the jury’s verdict, a conviction obtained through the knowing use of perjured testimony must be set aside. 
Olinger
, 176 Ill. 2d at 345, citing 
People v. Bagley
, 473 U.S. 667, 678-80, 87 L. Ed. 2d 481, 491-92, 105 S. Ct. 3375, 3381-82 (1985). Likewise, where the State allows false testimony to go uncorrected, the same principles apply. 
Olinger
, 176 Ill. 2d at 345, citing 
Napue v. Illinois
, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959). However, the State’s obligation to correct false testimony does not amount to an obligation to impeach its witnesses with any and all evidence bearing upon their credibility. 
People v. Pecoraro
, 175 Ill. 2d 294, 312-14 (1997).

Contrary to defendant’s claim, we find no evidence in the record that Metzger committed perjury when he testified that he had been a DNA research coordinator for the past five years. Although defendant notes that Metzger held the titles of forensic science administrator and public service administrator prior to testifying in this case, we note that the job descriptions of both positions were virtually identical, providing in relevant part that Metzger “
coordinates
 statewide integration of genetic marker (DNA) technology into the forensic serology program; [and]
 coordinates research efforts
 conducted by other forensic scientists within the specialty area.” (Emphases added.) It is clear from Metzger’s job description, then, that he was, in fact, a DNA research coordinator. The fact that Metzger testified to his job description rather than to his job title did not amount to perjury.

Likewise, there is no evidence in the record that Metzger had been demoted prior to testifying in this case. In fact, in connection with the disciplinary incident, the Director of Central Management Services for the State of Illinois sent Metzger a notice of approval of written charges dated May 19, 1995. That notice had spaces to be marked if discharge, demotion or suspension were part of the settlement agreement. Although there was a mark in front of the space for suspension, there were no marks in front of the spaces for discharge or demotion.

We likewise find no evidence that Metzger testified falsely when he stated that he had been continuously employed by the State Police for the previous 14 years. As noted above, the notice of approval of charges established that defendant had been suspended, but had not been discharged or demoted. We do not equate a suspension with a termination, and thus cannot say that Metzger committed perjury when he said that he had 14 years’ continuous employment with the State Police. Absent any evidence of perjury then, defendant has failed to establish a 
Brady
 violation with regard to Metzger’s testimony concerning his qualifications.

Defendant’s next claim with regard to Metzger’s testimony is that the State violated 
Brady
 because Metzger did not testify concerning the terms of his settlement with the State Police. Defendant argues that the terms of the settlement agreement were both favorable to the defense and material. Defendant claims that the evidence was material because there is a reasonable likelihood “that the suppressed evidence that David Metzger was dishonored and punished by the [State Police], and is a thief, could have affected the outcome.” Defendant contends that the evidence also was favorable because that evidence could have been used to impeach Metzger. Defendant maintains that the evidence at issue would have shown Metzger’s bias in favor of the government because Metzger’s natural bent would have favored law enforcement, which would have been heightened because he would have viewed his testimony against defendant as an opportunity to make amends for his misconduct.

Although defendant attributes great weight to Metzger’s theft of the microscope and the possibility that Metzger’s settlement with the State would establish his bias against defendant, we find that any connection between Metzger’s actions and his testimony against defendant to be tenuous at best. This court has previously found that any connection between Metzger’s theft of a state-owned microscope and a DNA analysis prepared two years prior to the theft was too remote and speculative to be used to impeach Metzger. 
People v. Bull
, 185 Ill. 2d 179 (1998).

Here, the State Police brought administrative charges against Metzger for an incident that occurred in January 1995, and the settlement agreement was entered into in May 1995. Metzger testified that he received the additional DNA samples in this case on October 23, 1992, and ran tests on those samples which indicated that an unknown assailant had committed the crimes. On April 15, 1993, Metzger received blood samples from defendant. Metzger then determined that defendant’s DNA matched that of Heather Stephens’ assailant. Metzger testified in defendant’s case in October 1995.

Although Metzger testified in this case after he had completed his suspension period with the State Police, his testimony was based upon a DNA analysis completed two years before the disciplinary action regarding the microscope. Consequently, we fail to see what incentive Metzger would have to fabricate DNA evidence based upon disciplinary proceedings that had not yet occurred. As in 
Bull
, evidence concerning Metzger’s settlement agreement was too remote and uncertain to be used to impeach Metzger. Accordingly, that evidence was neither material nor favorable to defendant. Defendant, therefore, has failed to establish a 
Brady
 violation with regard to that evidence.

Similarly, we find that defendant’s other 
Brady
 claims are not supported by the record. Defendant alleges that the State suppressed evidence that Metzger had been reprimanded in the past concerning sloppy or unprofessional work, suppressed evidence that Metzger was not certified in the use of DNA methodology when he began work in this case, and suppressed Metzger’s statement explaining how he had destroyed the original DNA evidence in the case. Defendant argues that the suppression of all this evidence violated 
Brady
 because the prosecution’s ability to convict defendant of capital murder depended upon its ability to convince the jury that Metzger was believable.

The reprimand for sloppy and unprofessional work, however, appears to be related to the destruction of the first DNA samples in this case. That reprimand, then, would be neither material nor favorable under 
Brady
, as defendant’s trial counsel knew that the evidence had been destroyed. Defendant’s trial counsel cross-examined Metzger concerning his destruction of the evidence. In addition, defendant’s expert witnesses were critical of Metzger’s destruction of the evidence in their testimony. Consequently, we cannot say that had the reprimand been disclosed, the result of the proceeding would have been different.

Likewise, there is no evidence to support defendant’s claim that Metzger was not certified in DNA methodology before he began work in this case. In fact, Metzger testified on cross-examination that he started doing DNA case work at the Illinois State Police crime lab in August of 1992. When questioned concerning whether he had taken a proficiency test prior to conducting the DNA testing in this case, Metzger said that he had taken such a test prior to August 1992, and explained that he knew he had taken such a test because he “wouldn’t have been allowed to do DNA analysis unless I’m certified.” The portion of Metzger’s personnel file cited by defendant in support of his claim that Metzger was not DNA certified is date stamped June 2, 1992, and states that “Mr. Metzger is working on becoming certified in DNA methods.” As this document is dated prior to August 1992, we fail to see how it could have been used to impeach Metzger.

Finally, with regard to defendant’s claim that the State suppressed Metzger’s written statement to the Will County sheriff explaining how he had destroyed the first DNA sample, the State responds that there is no evidence that such a document exists. Reference to a written statement appears in Metzger’s handwritten notes, which stated that the Will County sheriff wanted him to provide a written explanation for the destruction of evidence. There is no evidence, however, that Metzger ever actually wrote the letter. In any event, such a letter merely would have been cumulative of the evidence at defendant’s trial. As the State observed, Metzger testified at trial that the first DNA samples in this case were destroyed when he left them in restrictive enzyme too long. Defense counsel cross-examined Metzger concerning the destruction of evidence, and defendant’s expert witnesses criticized Metzger’s actions. While we agree with the State that there is no evidence that Metzger ever wrote the letter, we note that because the letter, if written, would have been cumulative of the evidence at trial, such evidence was neither material nor favorable under 
Brady
.

Defendant raises three additional issues with regard to Metzger’s personnel file. Defendant claims that: (1) he was denied the effective assistance of counsel when his lawyers were denied access to those files; (2) he was denied his right to present a defense when his attorneys were denied access to Metzger’s personnel file; and (3) he was denied his right to confront witnesses in violation of the Illinois Constitution and the United States Constitution when his attorneys were denied access to his personnel file.

As noted, this court has had an opportunity to address Metzger’s misconduct as to the microscope 
vis-a-vis
 his testimony in a criminal case. In 
People v. Bull
, 185 Ill. 2d 179 (1998), Metzger also testified as the prosecution’s DNA expert. On direct appeal of the defendant’s conviction and death sentence in that case, defendant argued that he had been denied a fair trial because the trial court had barred cross-examination of Metzger concerning his disciplinary record with the State Police. 
Bull
, 185 Ill. 2d at 205. The disciplinary record concerned the same incident at issue in this case, Metzger’s theft of a State Police microscope and the subsequent settlement agreement. There, as here, the defendant argued that Metzger’s disciplinary record established his motive to testify falsely or to embellish his testimony to please the State Police because he remained under a cloud of disgrace and had perilous job security, so that he would be strongly motivated to testify falsely in a biased manner in defense of his performance. 
Bull
, 185 Ill. 2d at 206. The defendant claimed he had the right to cross-examine Metzger regarding his biases, interests or motives to testify falsely. 
Bull
, 185 Ill. 2d at 206.

This court agreed with the trial court that Metzger’s disciplinary record would have been inadmissible to impeach him, noting that the record was too speculative and remote to infer that Metzger had something to gain or lose by his testimony. 
Bull
, 185 Ill. 2d at 207. Metzger had completed and reported his DNA analysis two years before the disciplinary event, and testified one year after the event. 
Bull
, 185 Ill. 2d at 207. Accordingly, the trial court did not err in barring the cross-examination of Metzger concerning his disciplinary record. 
Bull
, 185 Ill. 2d at 207.

Following 
Bull
, this court again addressed a defendant’s right to cross-examine a State expert witness with regard to the theft of a state-owned microscope. 
People v. Sims
, 192 Ill. 2d 592 (2000). In 
Sims
, the State’s DNA expert, Phillip Sallee, entered into a predisciplinary agreement with the State Police in connection with his theft of a state-owned microscope. 
Sims
, 192 Ill. 2d at 624. Like Metzger, Sallee’s agreement required him to perform community service, to be suspended from work without pay, and to forfeit vacation benefits. 
Sims
, 192 Ill. 2d at 624. The circuit court granted the State’s motion 
in limine
 to bar evidence of the predisciplinary agreement. 
Sims
, 192 Ill. 2d at 624. The defendant argued that because Sallee was performing DNA testing in his case at the time that he was the subject of disciplinary proceedings, Sallee “had a motive to curry favor with his employer by giving results favorable to the State’s case.” 
Sims
, 192 Ill. 2d at 626. The defendant therefore argued that the circuit court erred when it barred him from impeaching Sallee with evidence of the predisciplinary agreement. 
Sims
, 192 Ill. 2d at 624.

This court affirmed the circuit court’s order granting the motion 
in limine
, noting that any incentive on Sallee’s part to fabricate DNA evidence because of his disciplinary proceedings was remote and uncertain. 
Sims
, 192 Ill. 2d at 627-28. We noted:

“Defendant’s contention is that Sallee had a motive to fabricate DNA results which implicated defendant because at the time of the DNA testing, Sallee was facing disciplinary proceedings in the State Police crime lab. For this contention to be correct, a number of assumptions would have to be true. For example, it would have to be assumed that, having been discovered stealing microscopes and with his livelihood in jeopardy, Sallee’s immediate reaction would be to start fabricating evidence in a case which he was currently working on; that Sallee would begin fabricating evidence, with all the attendant risks of doing so, even though he did not yet know whether defendant’s case would be tried, or whether some other disposition, such as defendant pleading guilty or being exonerated by other evidence, would occur; that Sallee would risk fabricating evidence even though he did not yet know if he would, in fact, be called to testify at defendant’s trial; that he would risk fabricating evidence even though by doing so, he would be helping only the prosecutors in St. Clair County, who would have no control or ‘leverage’ over the disciplinary proceedings in the crime lab in Springfield; and that he would risk fabricating evidence as a means of lessening his administrative discipline even though the crime lab might reasonably be expected to be concerned about its reputation and integrity, and, therefore, might not look favorably upon one of its employee’s fabricating evidence.” 
Sims
, 192 Ill. 2d at 627.

Similar assumptions have to be true in this case in order to establish a connection between the theft of the microscope and Metzger’s DNA analysis. Moreover, in contrast to 
Sims
, where Sallee was performing DNA testing at the time he was subjected to disciplinary proceedings, Metzger prepared his DNA analysis two years prior to his testimony in defendant’s case, rendering the likelihood that Metzger would fabricate evidence even more uncertain and remote. For that same reason, defendant’s attempt to distinguish 
Bull
 on the ground that Metzger testified in this case shortly after he had returned to work following his suspension, fails. Even if Metzger testified in this case shortly after he returned to work following his suspension, his testimony was based upon an analysis prepared more than two years prior to his theft of the microscope.

Defendant also attempts to distinguish 
Bull
 and 
Sims
 on the grounds that: (1) the evidence in this case was not overwhelming; and (2) Metzger had destroyed the first DNA sample during testing. Neither factor, however, renders the connection between Metzger’s DNA analysis and his disciplinary incident any less speculative or remote. For that reason, we find that defendant was not denied an opportunity to present a defense or to cross-examine a witness when his attorneys were denied access to Metzger’s personnel file. It further follows that defendant was not denied the effective assistance of counsel when his attorneys were not permitted to review the personnel file.

III. Ineffective Assistance of Counsel

Defendant next argues that he was denied the effective assistance of trial counsel because his trial attorney failed to conduct an adequate investigation into mitigation evidence and failed to develop mitigation evidence sufficient to preclude imposition of the death penalty.

Claims of ineffective assistance of counsel are governed by the standards set forth in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To establish a claim of ineffective assistance of counsel, a defendant first must establish that his counsel’s performance was so deficient that his representation fell below an objective standard of reasonableness. 
Strickland
, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Once a defendant establishes that his counsel’s performance fell below an objective standard of reasonableness, he also must demonstrate that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. With regard to mitigating evidence, defense counsel has a duty to make a reasonable investigation into the mitigating evidence he will present at a defendant’s capital sentencing hearing, or he must have a sound reason for failing to make a particular investigation. 
People v. Morgan
, 187 Ill. 2d 500, 541 (1999). Nonetheless, courts reviewing trial counsel’s decisions regarding the presentation of mitigating evidence are highly deferential. 
People v. Towns
, 182 Ill. 2d 491, 513-14 (1998).

Strategic choices made by defense counsel following a thorough investigation into the law and facts relevant to a defendant’s plausible options are virtually unchallengeable. 
Towns
, 182 Ill. 2d at 514. Thus, an informed decision by defense counsel not to present certain mitigating evidence can be a valid strategic choice, entitled to judicial deference, where the evidence potentially is damaging to the defendant. 
Towns
, 182 Ill. 2d at 514. Where the lack of mitigating evidence presented at a defendant’s trial is not attributable to strategy, but instead to counsel’s failure to properly investigate mitigating evidence and to prepare a defense, such deference is not warranted. 
Towns
, 182 Ill. 2d at 514.

At the second stage of defendant’s death penalty hearing in this case, the State presented evidence in aggravation that defendant began sexually abusing his stepdaughter, Michelle Adermann, when she was nine years old. The sexual abuse continued until Michelle was 17 years old. Defendant also attempted to sexually abuse his other stepdaughter, Christine Adermann. Both Christine and Michelle told the officer investigating the sexual abuse that defendant had a violent temper. David Hickey, defendant’s son and the half brother of Christine and Michelle, also told the officer that defendant had a violent temper and frequently threatened Michelle. Defendant was arrested for the offense of criminal sexual assault based upon the incident with Michelle, and pled guilty to a felony count of sexual assault. On cross-examination, the officer said that defendant had admitted having a sexual relationship with Michelle, but had claimed that Michelle had initiated sexual intercourse twice because she was being grounded. The State also introduced evidence that defendant had a prior burglary conviction.

Harold Barnes, a social worker, testified on defendant’s behalf at the sentencing hearing. Barnes had been retained by defense counsel to investigate mitigating evidence in defendant’s case. In connection with that investigation, Barnes interviewed 16 members of defendant’s family and 21 neighbors and friends of defendant. Barnes testified that defendant was the fourth of six children born to Chester and Opal Hickey. When defendant was three years old, he was stricken with polio and had to wear a brace on one leg for two years. When defendant was around seven years of age, his mother began suffering nervous breakdowns and was hospitalized on a number of occasions. Defendant received poor to average grades and dropped out of school in high school.

Defendant was active in the Nazarene church during his adolescence. Defendant fell in love, got married and had two children, but eventually divorced because his wife was unfaithful. Sometime after his divorce, defendant began working for a salvage company. While working for that company, defendant and a man named William Conner both fell into a well. Because Conner was stunned as a result of the fall, defendant held onto Conner until help arrived and they were rescued.

Barnes said that defendant was convicted of burglary in 1978 and served seven months of confinement. During that time, he was a model prisoner. Barnes testified that everyone felt that defendant had learned from his mistakes. Sometime after he was released from prison, defendant married Linda Adermann and treated her three minor children as his own. Linda eventually left defendant, and left her children behind in defendant’s care.

Defendant was sentenced to the Illinois Department of Corrections in 1992 for the sexual assault of Michelle Adermann. During his incarceration, defendant received only one ticket for breaking rules, when he was late for a class. Barnes explained that this was “incredible” because penal institutions have so many rules. Barnes testified that he had done an exhaustive search of defendant’s background and found nothing to suggest violent behavior on defendant’s part.

Defendant’s younger sister, Diana Clover, also testified on defendant’s behalf. Diana testified that defendant supported Linda Adermann’s children financially and cared for them after Linda left him. Diana said that she currently was caring for Christine Adermann and David Hickey and said that both children loved their father.

Defendant contends that his trial counsel was ineffective in failing to contact any professionals, such as school personnel, social service personnel, or psychological experts, and in failing to obtain defendant’s medical records, school records, social service records or prison records. Defendant claims that school records would have revealed that defendant was a poor student, not an average student. In addition, the records would have revealed that defendant suffered from hearing and speech impairments. Defendant further claims that the mental illness of defendant’s mother and the physically abusive environment in which he was raised were grossly minimized. Defendant also contends that there was evidence that defendant suffers from neurological deficits and is borderline retarded. Defendant argues that evidence concerning his neurological and mental deficits would have diminished defendant’s culpability for his crimes.

Defendant argues that his trial counsel also was ineffective for failing to present evidence concerning the risk of defendant’s future dangerousness. Finally, defendant argues that trial counsel should have asked William Conner to testify that defendant had saved his life. Defendant claims that but for counsel’s failure to introduce the foregoing testimony, the outcome of defendant’s capital sentencing hearing would have been different.

In support of his claim that trial counsel was ineffective in failing to present mitigating evidence, defendant attached two affidavits to his amended post-conviction petition. The first affidavit was from Alice Washington, a forensic social worker employed by the State Appellate Defender’s office. Washington testified that defense counsel “seriously minimized the mental illness” of defendant’s mother, noting that defendant’s sister once observed her mother eat wallpaper off the wall. In addition, Washington stated that both of defendant’s parents were extremely abusive. Washington also stated that defendant was a poor student who was socially promoted from second through eighth grade, and that he had hearing and speech impairments. Washington further claimed that defendant’s medical records revealed that defendant had symptoms that were consistent with post-polio syndrome, which can have a profound physical and neurological impact. Finally, Washington stated that defendant had been examined by Dr. Harry Gunn, and was found to have a full scale IQ of 73, which is borderline retarded.

The second affidavit attached to defendant’s post-conviction petition was the affidavit of Mark D. Cunningham, Ph.D., a clinical and forensic psychologist. Cunningham stated that “important perspectives” regarding defendant’s risk of violence in prison could have been presented at his sentencing hearing. Cunningham based the violence risk assessment on actuarial data that capital offenders have a low rate of institutional violence. In addition, defendant had multiple factors which would be expected to reduce his prison violence risk. These factors included his age, his prior adaptation to prison, the absence of violent disciplinary write-ups during his incarceration, the absence of prison gang involvement, and his continued relationship with his family. Cunningham opined that defendant’s violence risk assessment could have been critically important mitigating evidence.

Based upon the information contained within the affidavits of Washington and Cunningham, defendant argues that this case is similar to 
People v. Morgan
, 187 Ill. 2d 500 (1999). In 
Morgan
, this court held that defense counsel’s failure to investigate and present mitigating evidence failed to satisfy the reasonably objective standard of 
Strickland
 and that the deficient performance of defense counsel was so prejudicial that the defendant was denied a fair sentencing hearing. 
Morgan
, 187 Ill. 2d at 548-49.

Defense counsel in 
Morgan
 was told of the defendant’s seizures and related medical problems shortly after counsel was retained. 
Morgan
, 187 Ill. 2d at 542. In his opening statement during the defendant’s sentencing hearing, defense counsel told the court he would present evidence regarding medical problems the defendant had suffered and still suffered. 
Morgan
, 187 Ill. 2d at 542. The defendant attached affidavits to his post-conviction petition indicating that defense counsel had not contacted the affiants during trial and never asked defendant’s family for potential mitigating evidence or witnesses. 
Morgan
, 187 Ill. 2d at 543. Defense counsel also failed to inquire about defendant’s family history, which showed defendant’s abusive and violent childhood. 
Morgan
, 187 Ill. 2d at 543. In finding that defense counsel’s conduct constituted ineffective assistance of counsel, we noted that the trial judge indicated that his sentence was clearly influenced by the lack of evidence in mitigation. 
Morgan
, 187 Ill. 2d at 549.

We find this case to be distinguishable from 
Morgan
. Here, Barnes interviewed 16 members of defendant’s family and 21 neighbors and friends of defendant during his investigation into mitigating evidence. Contrary to defendant’s claim that defense counsel did not present evidence that defendant did poorly in school, we note that Barnes did testify that defendant was a poor to average student and dropped out of school entirely in high school.

Nor do we agree that defense counsel “seriously minimized the mental illness” of defendant’s mother. Barnes testified that defendant’s mother began having nervous breakdowns when defendant was seven, and was hospitalized several times as a result of those nervous breakdowns. Although defense counsel did not present evidence suggesting that defendant’s parents were abusive, we note that evidence of a defendant’s turbulent childhood is not inherently mitigating. 
People v. Montgomery
, 192 Ill. 2d 642, 673 (2000). A sentencing authority might regard such evidence as aggravating, especially if the evidence suggests that the defendant might present a danger in the future. 
Montgomery
, 192 Ill. 2d at 673. Further, the jury was told that defendant had saved the life of William Connor. Connor’s testimony in this regard, then, would have been cumulative. See 
People v. Brisbon
, 164 Ill. 2d 236, 248 (1995) (counsel not ineffective for failing to introduce cumulative testimony).

In addition, nothing in the record suggests that defense counsel was aware or should have been aware that defendant may have suffered brain damage or “post-polio syndrome.” There is no evidence to suggest that defense counsel was aware at the sentencing hearing that defendant may have suffered brain damage. Defendant never made any claim that he was mentally ill or insane at the time of the crimes. Moreover, we find defendant’s reliance on Washington’s affidavit to be misplaced. Washington, who was not a medical doctor, stated that “[a] review of [defendant’s] medical records (which the defense did not obtain) and an interview with [defendant] reveal symptoms which are consistent with Post-Polio Syndrome. The late effects of polio can have a profound physical and neurological impact.” Washington also claimed that defendant had been examined by Dr. Harry Gunn, a psychologist, and had achieved a full scale IQ of 73, which is borderline retarded. The State responds that post-polio syndrome is a muscular problem, not a neurological problem.

Washington’s affidavit is speculative at best. As noted, she was not a medical doctor and thus was not qualified to determine whether defendant had a neurological problem. In addition, we observe that in the report prepared by Dr. Gunn, Dr. Gunn clarifies that with regard to defendant’s IQ test, “there are questions about the validity since [defendant] had only one free hand.” Given the speculative nature of Washington’s affidavit, as well as the fact that defendant never placed his sanity or mental condition at issue, we cannot say that defendant’s trial counsel was ineffective in failing to pursue evidence that defendant may have suffered some type of brain damage or post-polio syndrome.

We also have examined the reports of Dr. William Adair and Jonathan Hess, a clinical neuropsychologist, which were attached to defendant’s motion to reconsider. We find nothing in these reports to suggest that defendant’s trial counsel should have investigated or presented evidence of defendant’s possible brain damage. “A sentence will not be vacated on speculation of what a mental examination may have revealed, when the defendant failed to raise the issue of his mental condition.” 
Brisbon
, 164 Ill. 2d at 252.

Finally, we find no evidence to support defendant’s claim that his counsel was ineffective in failing to present evidence regarding the risk of defendant’s future dangerousness. The affidavit of Mark Cunningham was prepared approximately three years after defendant was sentenced. Although defendant maintains that the information contained within Cunningham’s affidavit was based upon data available at the time of defendant’s sentencing, we cannot say that counsel was ineffective in failing to gather such “actuarial data.” In any event, defense counsel did introduce evidence that defendant was a model prisoner when he served time on his burglary conviction and had received only one ticket since his 1992 incarceration, which was “incredible.” Barnes also testified that he had done an exhaustive search of defendant’s background and found nothing to suggest that defendant was violent. Nonetheless, the jury apparently found that defendant’s good behavior in prison did not offset the aggravating factors. It is well established that a defendant’s good behavior in prison is insufficient to offset the aggravating evidence against the defendant. 
People v. Emerson
, 189 Ill. 2d 436, 495 (2000).

We find nothing in the record to establish that defendant’s trial counsel was ineffective with regard to the mitigating evidence presented on behalf of defendant. Accordingly, the trial court did not err in dismissing this claim without an evidentiary hearing.

IV. Defendant’s Absence from a Portion of Juror Deliberations

Defendant next claims that he was denied his constitutional right to due process, to the effective assistance of counsel, and his right to a reliable sentencing hearing, under the fifth, sixth, eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, VI, VIII and XIV), because he was not present in court when the trial jury sent out five notes during its deliberations. In the notes, the jury requested numerous items of evidence. The trial court’s written response to the notes did not address some of the requested items and, with regard to other items, told the jury that the items were not evidence and that the jury should recall the testimony concerning those items. In addition, with regard to requests for witness testimony, the trial court told the jury that no transcripts were available. Defendant contends that he could have had some input into the nature of the communication with the jury, so that his absence from the courtroom violated his constitutional rights.

A criminal defendant has a general right to be present at every stage of his trial. 
People v. Bull
, 185 Ill. 2d 179, 201 (1998). However, the situations where a defendant’s rights under the Illinois and the United States Constitutions are violated due to the denial of his right to be present at every stage of his trial are limited. 
Bull
, 185 Ill. 2d at 201. It is only where the defendant’s absence results in the denial of an underlying substantial right that error is committed. 
Bull
, 185 Ill. 2d at 201. Thus, defendant’s right to due process under the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) would be implicated only where the defendant’s absence resulted in the denial of a fair and just trial. 
Bull
, 185 Ill. 2d at 201.

A defendant, then, “ ‘is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.’ “ 
People v. Bean
, 137 Ill. 2d 65, 83 (1990), quoting 
Kentucky v. Stincer
, 482 U.S. 730, 745, 96 L. Ed. 2d 631, 647, 107 S. Ct. 2658, 2667 (1987). Consequently, if it does not appear that a defendant’s absence resulted in an unfair trial, a defendant’s constitutional rights were not violated by his absence. 
Bean
, 137 Ill. 2d at 83.

Although defendant claims that he could have had some “input” into the nature of the communication with the jury, defendant has not alleged or established how his absence from the courtroom when the jury sent out five notes denied him a fair and just trial. As in 
Bean
, “[d]efendant’s argument is based on broad principles and is not adapted to the specifics of this case.” 
Bean
, 137 Ill. 2d at 84. We find nothing in the record indicating that defendant’s presence would have contributed to the fairness of the procedure. Because the fairness of defendant’s trial was not affected by defendant’s absence from this portion of the trial, defendant was not denied his due process rights.

V. Death Penalty Instructions

Finally, defendant claims error with regard to the jury instructions submitted at his trial. Defendant claims that those instructions were unconstitutionally vague and confusing, in violation of his right to due process. Defendant further claims that he was denied the effective assistance of counsel where his trial attorneys failed to tender alternative jury instructions.

In support of this claim, defendant cites studies conducted by Professor Hans Zeisel and by Professor Shari Diamond, which purported to test the ability of potential jurors to comprehend Illinois death penalty instructions. Defendant concedes that this court previously has found that the conclusions of both Professor Zeisel and Professor Diamond did not establish that the Illinois death penalty instructions were constitutionally infirm. See 
People v. Jackson
, 182 Ill. 2d 30, 93 (1998); 
People v. Brown
, 172 Ill. 2d 1, 55-56 (1996). Defendant also concedes that this court previously has declined to reconsider its views concerning the Zeisler and the Diamond studies. See 
Jackson
, 182 Ill. 2d 30; 
People v. Hobley
, 182 Ill. 2d 404, 468 (1998). Nonetheless, defendant has asked this court to reconsider the Illinois death penalty instructions in light of the recent renewed concerns regarding the procedural safeguards in place with regard to the imposition of death.

We decline the invitation to reconsider our views concerning the Zeisler and Diamond studies. Aside from raising general concerns about procedural safeguards surrounding the imposition of the death penalty, which this court has addressed in its comprehensive new rules governing capital cases, defendant has failed to set forth any argument persuading this court to reexamine its views concerning the Zeisler and Diamond studies.

Defendant also makes a related claim that he was denied the effective assistance of counsel where his trial attorneys did not tender alternative jury instructions. As noted, to establish that counsel’s performance was deficient, a defendant must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the sixth amendment. 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Defendant argues that his trial counsel was ineffective in accepting jury instructions which half of tested subjects misunderstood, and further argues that had his counsel tendered alternative instructions, the result of his sentencing hearing would have been different.

We disagree. As discussed, this court has rejected the studies concluding that half of the tested subjects misunderstood the death penalty instructions. Consequently, defense counsel was not deficient in failing to tender alternative jury instructions.

NEW SUPREME COURT RULES

As a final matter, we address the issues raised in the dissents. The Chief Justice, in his dissent, makes the dire statement that the system for capital punishment has collapsed. While we certainly are aware of those cases in which a defendant had been convicted and sentenced to death, but later was exonerated and released from prison, we do not infer from these cases that the entire system has collapsed. The Governor declared a moratorium on future executions after several death row defendants were exonerated. We do not infer from the moratorium, however, that every capital trial has been unreliable and that all appellate review has been haphazard.

Chief Justice Harrison, also contends that this case illustrates the shortcomings of the system because the DNA evidence used to convict defendant was of dubious validity. Citing this court’s opinion on direct appeal, Chief Justice Harrison notes that the “quality assurance standards of the laboratory were questionable. 
Hickey
, 178 Ill. 2d at 271 [hereinafter 
Hickey I
].” Slip op. at 36 (Harrison, C.J., dissenting). He further notes that the “discovery of additional samples raised suspicions” and that “[v]irtually all of the samples had degraded or were of poor quality. 
Hickey
, 178 Ill. 2d at 272.” Slip op. at 36 (Harrison, C.J., dissenting).

Taking the Chief Justice’s dissent at face value, the uninformed reader might justifiably assume that, in 
Hickey I
, this court made affirmative findings as to the “dubious validity”of the DNA evidence. Indeed, the Chief Justice supports his assertion as to the “dubious validity” of this evidence with pinpoint citations to 
Hickey I
. What the Chief Justice fails to point out, however, is that the cited portions of 
Hickey
 
I
 come not from this court’s holding but rather straight from the mouths of defendants’ experts. See 
Hickey
, 178 Ill. 2d at 271-72. The Chief Justice conveniently ignores the portions of 
Hickey I 
summarizing 
the State’s expert
 
witness
, who testified that the Illinois State Police laboratory procedures and protocol were scientifically valid and that there was no evidence of degradation of the DNA in this case. 
Hickey
, 178 Ill. 2d at 270-71.

Given the conflicting expert testimony as to the quality of the DNA evidence, the issue became one for the jury to decide. Indeed, this court noted as much in addressing defendant’s claim that the trial court should have held a hearing pursuant to 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923), holding that the issues defendant raised concerning the caliber of Metzger’s work, “including laboratory protocol and the manner in which it was followed, the various quality control and quality assurance measures which Metzger employed, and the possible contamination or degradation of the DNA samples,” go to the weight of that evidence. 
Hickey
, 178 Ill. 2d at 279. In convicting defendant, the trial jury, as the trier of fact, apparently found the testimony of the State’s expert witnesses to be more credible than the testimony of defendant’s expert witnesses, a finding which this court affirmed on direct appeal. Nonetheless, the Chief Justice now relies upon the testimony of the defendant’s trial experts as providing factual support for the reversal of defendant’s conviction.

We recognize that Chief Justice Harrison strongly and sincerely disagrees with the majority’s conclusion concerning retroactive application of the new supreme court rules. The strength of that conviction, however, hardly justifies a conscious effort to pass off the controverted testimony of certain defense experts as the official position of this court.

That said, throughout the years, this court and the General Assembly have worked to include additional safeguards to the many protections awarded a criminal defendant. 
Bull
, 185 Ill. 2d at 216. To that end, this court recently adopted a comprehensive set of new rules governing capital cases. The Chief Justice interprets these rules as establishing “[a] new, irreducible standard,” such that any conviction obtained prior to the adoption of the rules cannot stand. Slip op. at 38 (Harrison, C.J., dissenting). Under that analysis, the failure to follow the new rules establishes a 
per se
 constitutional violation warranting relief under the Act (725 ILCS 5/122–1 (West 1998)). The problem with this interpretation is that if we were to assume that a violation of the new rules amounted to a 
per se
 constitutional violation entitling a defendant to post-conviction relief, then we would have to assume the converse to be true: that adherence to the new rules would preclude post-conviction relief because a defendant could not show a constitutional violation. This conclusion is contrary to both the spirit and the letter of the Act.

Both dissents find that the new rules are of such constitutional magnitude that retroactive application of the rules is required. The Chief Justice states that the new rules “are so essential to the fairness and accuracy of capital cases” that any conviction obtained under the old rules cannot stand. Slip op. at 39 (Harrison, C.J., dissenting). Likewise, Justice Kilbride concludes that the new rules “establish a watershed rule of criminal procedure” which “implicate the fundamental fairness and the accuracy of a trial.” Slip op. at 39-40 (Kilbride, J., dissenting). These conclusions, however, are at odds with the rules themselves, which provide that the new rules are immediately effective, “except when in the opinion of the trial, Appellate, or Supreme Court the application of the amended provisions in a particular case pending at the time the amendment becomes effective would not be feasible or would work an injustice, in which case former procedures would apply.” See 188 Ill. 2d Rs. 411, 412, 416, 417. If the new rules in fact were of the constitutional magnitude proposed by dissents, the new rules would not, and indeed could not, contain a provision allowing a court, in its discretion, to apply the former rules. Quite simply, the positions taken by the dissents are at odds with the plain language of the new rules.

Nonetheless, based upon the dissents’ findings that the new rules set a new constitutional standard, the dissents conclude that because the new rules had not been enacted at the time of defendant’s conviction and sentencing, defendant’s conviction and sentence must be vacated, and the cause must be remanded “for a new trial in conformity with our new rules.” Slip op. at 40 (Harrison, C.J., dissenting). In fact, the Chief Justice would have this court vacate all convictions in capital cases which were obtained prior to March 1, 2001, the effective date of the new rules. Such a result was never intended by this court in adopting the rules.

The new rules governing capital cases create rules of procedure. The safeguards set forth in the new rules are broader than the constitutional rights they protect. A violation of procedures designed to secure constitutional rights should not be equated with a denial of those constitutional rights. This court could decide to repeal the new rules, or we could further amend the rules to delete some provisions and to add others, something we could not do if those rules established constitutional rights. The new rules do not set a constitutional standard. Alleged violations of rules of procedure which do not violate a defendant’s constitutional rights do not warrant post-conviction relief. 
People v. Hangsleben
, 43 Ill. 2d 236, 238 (1969).

In support of his proposition that the new rules establish a “watershed rule of criminal procedure,” Justice Kilbride cites the United States Supreme Court’s decision in 
Teague v. Lane
, 489 U.S. 288, 311-12, 103 L. Ed. 2d 334, 356-57, 109 S. Ct. 1060, 1076 (1989). However, that our new rules “establish a watershed rule of criminal procedure” is not, under 
Teague
, the linchpin of retroactivity. In 
Teague
, the United States Supreme Court held that decisions establishing new 
constitutional 
rules of criminal procedure are not to be applied retroactively to cases pending on collateral review unless the new rule either (i) places certain kinds of primary, private individual conduct beyond the power of the criminal-law-making authority to proscribe, or (ii) requires the observance of those procedures that are implicit in the concept of ordered liberty. 
Teague
, 489 U.S. at 307, 103 L. Ed. 2d at 353, 109 S. Ct. At 1073. This court has adopted the 
Teague
 test. See 
People v. Flowers
, 138 Ill. 2d 218 (1990).

As noted, the new rules of this court are not of constitutional dimension in and of themselves. They function solely as devices to further protect those rights given to defendants by the federal and state constitutions, such as, for example, the right to counsel and the right to a fair trial. Our new rules were designed to help remedy some of the problems that were perceived to be the root cause of past erroneous convictions. For example, most reversals occur because of (i) ineffective assistance of trial counsel, (ii) prosecutorial misconduct which deprives a defendant of a fair trial, and (iii) trial judge error. Recognizing this, this court adopted rules designed to minimize these problems in future. These rules therefore help to avoid future reversals based on instances of constitutionally incompetent representation and improper prosecutorial conduct, among other things. Notwithstanding the promulgation of these rules, errors will occur. These errors may well require reversal–not because the rules themselves were violated–but because certain fundamental constitutional violations occurred. It is the departure from constitutional principles that make a criminal proceeding unreliable, not failure to observe rules of this court. For this reason, we do not believe that the rules can or should be viewed as constitutional such as to implicate a 
Teague
 analysis.

Moreover, Justice Kilbride states that Rule 714, which imposes standards on attorneys who will appear in capital trials, “implicitly eliminates a defendant’s right to proceed 
pro
 
se
 in a capital trial, effectively overruling 
People v. Coleman
, 168 Ill. 2d 509 (1995).” According to Justice Kilbride, this fact is reason alone to find that the new rules are “of significant constitutional dimension” Slip op. at 40 (Kilbride, J., dissenting). Justice Kilbride further maintains that, contrary to 
Coleman
, capital defendants do not enjoy the right to self-representation.

The United States Supreme Court in 
Faretta v. California
, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), held that the right to counsel provided by the sixth amendment (U.S. Const., amend. VI) includes within it the right to self-representation in criminal trials. In addition, a criminal defendant has a constitutional right to refuse state-provided counsel if the choice to proceed on his or her own is made intelligently and voluntarily. 
Faretta
, 422 U.S. at 821, 45 L. Ed. 2d at 573-74, 95 S. Ct. at 2534. In Illinois, our state constitution provides similar protections to defendants and likewise protects a defendant’s right to self-representation. This court has rejected the notion of forcing a capital defendant who elects to proceed 
pro se
 to be represented by counsel. 
People v. Coleman
, 168 Ill. 2d 509 (1995). In so holding, we cited expressly to 
Faretta
. To hold, as the dissent would, that Rule 714 overrules 
Coleman 
would call into question the legitimacy of 
Faretta
. As this court stated in 
People v. Simpson
, Nos. 85084, 86926 cons. (September 27, 2001), slip op. at 29, “the new rules create neither a constitutional standard that overrules established constitutional rights nor invalidate prior decisions upholding those rights.”

In light of the above, we do not believe that the rules can or should be viewed as constitutional such as to implicate a 
Teague
 analysis.

Finally, we note that the Chief Justice cites to our recent case of 
People ex rel. Birkett v. Bakalis
, No. 90114 (June 21, 2001), in support of his contention that the new rules should be applied here. We believe the Chief Justice’s position is wide of the mark. The capital proceeding at issue in 
Bakalis
 was in the 
pretrial
 stage when the matter was brought to this court. During the pendency of the appeal in this court, the new rules took effect. Certainly the rules, to the extent applicable, will govern a case in that procedural posture as well as any other case now coming to trial in the circuit courts of this state. As such, the 
Bakalis
 case is inapposite.

CONCLUSION

For the reasons stated, the judgment of the circuit court of Cook County dismissing defendant’s post-conviction petition without an evidentiary hearing and denying defendant’s discovery requests, is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 15, 2002, as the date on which the sentence of death shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 2000). The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

Affirmed.

CHIEF JUSTICE HARRISON, dissenting:

The system for imposing capital punishment in Illinois has collapsed. Trial proceedings had become so unreliable and appellate review so haphazard that the Governor was eventually forced to step in and declare a moratorium on future executions. That moratorium, announced on January 31, 2000, remains in effect. See 
People v. Simms
, 192 Ill. 2d 348, 432 (2000) (Harrison, C.J., dissenting).

Legislative and executive branch committees are investigating whether the failures in our death penalty law can be remedied or whether the death penalty should simply be abolished.
(footnote: 1) As we await their conclusions, our court has formed its own committee to examine the problem. Based upon the work of that committee, we have adopted a comprehensive set of new rules governing the conduct of cases in which the State is seeking the death penalty. With certain exceptions, the new rules took effect March 1, 2001. 

The new rules clarify the duty of prosecuting attorneys (amended Rule 3.8 of the Rules of Professional Conduct), establish mandatory programs to improve the knowledge and skill of trial judges who may be called upon to preside over capital cases (Rule 43), extend criminal discovery rules to capital sentencing hearings (Rule 411), and impose on the State a duty to make a good-faith effort to identify material or information which tends to negate the guilt of the accused or reduce his punishment (Rule 412). The rules also create a new set of procedures that must be followed in capital cases. Among theses are rules which require the State to give prompt notice of its intention to seek or reject imposition of the death penalty, limit eligibility to serve as defense counsel to attorneys who meet stringent new minimum qualifications, authorize discovery depositions in capital cases, mandate case management conferences after the State has disclosed its intention to seek the death penalty, and obligate the State to certify before trial that it has complied with its disclosure duties (Rule 416). In addition, new pretrial disclosure rules are imposed with respect to DNA evidence (Rule 417).

As the committee comments to these rules indicate, they are designed “to ensure that capital defendants receive fair and impartial trials and to minimize the occurrence of error in capital trials.” 188 Ill. 2d R. 416, Committee Comments, at lxxii. These are objectives that were clearly not being met under the old law. Indeed, in many cases under the old law, there was no longer even a pretense of fairness or accuracy. A majority of this court expressly conceded the inherent unreliability of the system. 
People v. Bull
, 185 Ill. 2d 179, 215-18 (1998). Utter ineptitude was accepted as adequate representation. 
People v. Rissley
, No. 82536, slip op. at 11 (March 15, 2001) (Harrison, C.J., dissenting). Appeals were illegally and summarily dismissed. 
People v. Kokoraleis
, M.R. 15833, Official Reports Advance Sheet No. 11, at 4-7 (June 2, 1999).

The case before us today illustrates many of the system’s shortcomings. Defendant is a polio victim with hearing and speech impediments whose intelligence is borderline retarded. The surviving victim’s initial description of her assailant bore no similarity to defendant, and when asked to identify defendant later, she stated that she had never seen him before. 
People v. Hickey
, 178 Ill. 2d 256, 263-64 (1997). No fingerprints, shoe impressions or fiber evidence connected defendant to the crime. The murder weapon was not linked to him. A man seen by the victims’ automobile after the crime did not resemble defendant. 
Hickey
, 178 Ill. 2d at 264-67, 273-74.

What convicted defendant was DNA evidence. The DNA evidence used against him, however, was of dubious validity. The quality assurance standards of the laboratory were questionable. 
Hickey
, 178 Ill. 2d at 271. The initial samples were destroyed through mishandling. The discovery of additional samples raised suspicions. Virtually all of the samples had degraded or were of poor quality. 
Hickey
, 178 Ill. 2d at 272. In addition, the State employee who performed the tests was reprimanded for sloppy and unprofessional work, was found to have been dishonest, and was disciplined for stealing state property.

Despite the weaknesses in the State’s case, the jury convicted defendant and he was sentenced to death. Despite the array of problems that developed before and during defendant’s trial, the majority has found a way to affirm the conviction and sentence. The formal process was honored. If the capital punishment debacle of the last few years has taught us anything, however, it is that adherence to the formal process, as it existed under the old law, can produce results that seem rational but are, in fact, completely unreliable.

In addressing the shortcomings of the past, the new supreme court rules for capital cases reflect a basic shift in this court’s conception of what is necessary to provide capital defendants with a fair trial. Our tolerance for prosecutorial gamesmanship and professional incompetence has evaporated. From now on, the success of prosecutors will be gauged by how well they cooperate in the search for truth and justice, not by the number of convictions they secure. It cannot be any other way. The old priorities do not work. When convictions are prized above justice, innocent men are sentenced to die. It has happened too often in Illinois It must stop.

The evidence presented to our committee and the committee’s subsequent recommendations have persuaded us that the procedures contained in the new rules are indispensable for achieving an accurate determination of innocence or guilt. Those procedures will not necessarily assure that error will be eliminated from every murder case in which the State seeks the death penalty. Without them, however, no capital proceeding can be deemed reliable.

As a general rule, changes in the law which are procedural in nature, as these rules are, apply to all cases pending on direct review without regard to whether the claims arose before or after the change in the law occurred.
 People v. Nitz
, 173 Ill. 2d 151, 162 (1996), 
overruled on other grounds by
 
People v. Mitchell
, 189 Ill. 2d 312 (2000); 
Maiter v. Chicago Board of Education
, 82 Ill. 2d 373, 390 (1980). That is unquestionably so where the new law expressly defines its temporal reach to include pending cases. See 
Commonwealth Edison v. Will County Collector
, 196 Ill. 2d 27, 38 (2001) (where legislature has clearly indicated what the temporal reach of an amended statute should be, that expression of legislative intent must be given effect absent a constitutional prohibition).

The same is true of rules promulgated by this court. Our court has the authority to specify the particular date new rules or amendments to rules take effect. If we so specify, the effective date of the new rules “shall be as ordered.” 188 Ill. 2d R. 3(g). Once the effective date has been reached, the new rules are applicable to all cases pending on direct review, even cases which commenced before the rules were enacted. That is so because, as with new procedural statutes, rules of court which are procedural in nature have retroactive application. See
 Jarmon v. Jinks
, 165 Ill. App. 3d 855, 863 (1987).

Because rules of procedure apply retroactively, we have not hesitated to apply our new rules governing capital cases to cases coming before us on direct review. See 
People ex rel. Birkett v. Bakalis
, No. 90114, slip op. at 2 (June 21, 2001). We should take the same approach in cases such as this one which come before us in the context of post-conviction proceedings.

 A court’s adoption of new rules of court governing criminal procedure is analogous to its issuance of a judicial opinion recognizing new rules of criminal procedure. Where the court issues an opinion announcing new rules of criminal procedure and the rules are of constitutional dimension, the new rules may be invoked by other defendants in other cases on collateral review where such rules implicate the fundamental fairness and accuracy of the trial. 
People v. Caballero
, 179 Ill. 2d 205, 220-21 (1997). To qualify for application under this principle, the new rules must be aimed at improving the accuracy of trial and be of such importance that they alter our understanding of the bedrock procedural elements essential to a fair trial. 
Sawyer v. Smith
, 497 U.S. 227, 242, 111 L. Ed. 2d 193, 211, 110 S. Ct. 2822, 2831 (1990). For the reasons previously discussed, the new rules governing capital cases plainly meet this requirement. They represent a basic and unprecedented shift in our conception of what we must do to afford defendants a fair trial in death penalty cases and to assure that the results of such trials are consistently reliable. A new, irreducible standard has been set.

Now that the new standard is in place, we cannot countenance any conviction or sentence in a capital case where the standard has not been followed. If the new rules are so essential to the fairness and accuracy of capital cases and if we are serious about our intention to improve the reliability of capital proceedings, we must disavow any presumption as to the fairness and accuracy of death penalty cases prosecuted under the old law. The only presumption to be made at this point is that any conviction and sentence obtained without the aid of the new rules is invalid. Because the defendant in the case before us was tried, convicted and sentenced without the benefit of the new rules, his conviction and sentence should therefore be vacated and the cause should be remanded to the circuit court for a new trial in conformity with our new rules.

Even if defendant were not entitled to a new trial, I still could not join in the majority’s opinion. For the reasons set forth in my partial concurrence and partial dissent in
 People v. Bull
, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). At a minimum, defendant’s sentence of death should therefore be vacated, and the cause should be remanded to the circuit court for imposition of a sentence of imprisonment. 720 ILCS 5/ 9–1(j) (West 1994).

JUSTICE KILBRIDE, also dissenting:

I agree with Chief Justice Harrison’s conclusion that the new supreme court rules governing capital cases should be applied retroactively. Like many other capital convictions tried under the old rules, defendant’s conviction in this case remains suspect because it was obtained through procedures that were inherently unreliable and did not adequately protect a defendant’s constitutional rights. See 188 Ill. 2d R. 714, Committee Comments, at cxiii (acknowledging “problem” in capital trials under old system and the need to safeguard fairness and accuracy). In remedying this monumental wrong, the new rules establish a watershed rule of criminal procedure (s
ee 
Teague v. Lane
, 489 U.S. 288, 311-12, 103 L. Ed. 2d 334, 356-57, 109 S. Ct. 1060, 1076 (1989)), particularly with regard to the new mandatory minimum eligibility standards established by Rule 714 for the Capital Litigation Trial Bar (see 188 Ill. 2d Rs. 714(a) through (g)).

While imposing substantial standards on capital attorneys, Rule 714, on its face, provides no exception to these standards for defendants who choose to represent themselves. As a result, Rule 714 implicitly eliminates a defendant’s right to proceed 
pro
 
se
 in a capital trial, effectively overruling 
People v. Coleman
, 168 Ill. 2d 509 (1995), on that point. For this reason alone, contrary to the majority’s conclusion, the new rules are of significant constitutional dimension. Moreover, by imposing minimum standards on capital attorneys and establishing other procedural safeguards for capital cases, the new rules implicate the fundamental fairness and the accuracy of a trial, thus necessitating retroactive application. 
Teague
, 489 U.S. at 311-12, 103 L. Ed. 2d at 356-57, 109 S. Ct. at 1076; 
People v. Caballero
, 179 Ill. 2d 205, 220-21 (1997); 
People v. Flowers
, 138 Ill. 2d 218 (1990).

Those who disagree with my conclusion will undoubtedly argue that 
Faretta v. California
, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), afforded 
all
 defendants the right to proceed at trial without counsel. 
Faretta
 did not, however, decide whether the right of self-representation applies to 
capital
 defendants. In fact, 
Faretta
 was decided in 1975 when the death penalty was unconstitutional. See 
Furman v. Georgia
, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). Thus, I disagree that we are constrained by 
Faretta
 to hold that capital defendants possess a federal constitutional right to self-representation. See 
People v. Wagener
, 196 Ill. 2d 269, 287 (2001) (while bound to follow the United States Supreme Court's interpretation of the Constitution of the United States, we are not bound to extend those decisions to issues not specifically decided). More importantly, a broadening of the 
Faretta
 right to encompass capital defendants is fundamentally at odds with the stated purpose of the new rules of assuring the accuracy and fairness of capital trials. The problems 
pro
 
se
 defendants pose to the accuracy of trials
 were partially articulated in 
Powell v. Alabama
, 287 U.S. 45, 69, 77 L. Ed. 158, 170, 53 S. Ct. 55, 64 (1932):

“Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he [has] a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect.”

Therefore, in view of the significant number of capital defendants who have been defended with the assistance of counsel and erroneously convicted, I cannot countenance the notion that a 
pro se capital defense
 is sufficiently competent in the face of the most serious proceeding in our criminal justice system.

In rejecting the conclusion that the new rules should apply retroactively, the majority partially relies upon a curious rationale, namely, that to accept Chief Justice Harrison’s view would mean that the simple “adherence to the new rules would preclude post-conviction relief because a defendant could not show a constitutional violation.” Slip op. at 31. The majority incorrectly assumes this conclusion to be a natural extension of Chief Justice Harrison’s view that nonadherence to the new rules is a 
per se
 constitutional violation. As the committee comments indicate, the new rules were designed to minimize, not eliminate, the occurrence of errors. 188 Ill. 2d R. 416, Committee Comments, at lxxii. Plainly put, adherence to the new rules will not result in the trial of every capital case occurring without constitutional error. Unfortunately, errors of constitutional dimension will continue to occur, including the types alleged to have occurred in this case. Therefore, under Chief Justice Harrison’s view of the new rules, post-conviction petitions would continue to be a viable means for aggrieved defendants to bring to light alleged violations of their constitutional rights.

The dire need for the establishment of the minimum safeguards established by the new rules is evidenced by two capital cases recently reviewed by this court: 
People v. Rissley
, No. 82536 (March 15, 2001), and 
People v. Barrow
, 195 Ill. 2d 506 (2001). As detailed by Chief Justice Harrison, the appointed defense counsel in 
Rissley
 was woefully unqualified and unprepared to represent a capital defendant. 
Rissley
, slip op. at 51 (Harrison, C.J., dissenting). Witnesses at the post-conviction hearing testified that, among other slightly less egregious conduct,
 defense counsel
 failed to file a motion to suppress; conducted no investigation; slept through some of the proceedings; and persuaded the defendant into pleading guilty while the late-appointed co-counsel was out of town attempting to prepare defense testimony. See
 Rissley
, slip op. at 20-51 (Harrison, C.J., dissenting). Even though Chief Justice Harrison’s dissent in
 Rissley
 may be read as critical of the prosecutor, I view the record in that case as partially illustrating the extreme difficulties faced by all parties when an untrained, appointed defense attorney is allowed to defend a capital defendant. The conduct of the appointed defense counsel in 
Barrow
 was no less objectionable. In that case, among other transgressions
, the attorney failed to present any defense whatsoever. 
Barrow
, 195 Ill. 2d at 520.
 Thus, the new rules were promulgated to remedy such fundamental problems as were presented in each of these cases.

At a bare minimum, the resolution of the retroactivity issue should have been more fully addressed by this court following the submission of supplemental briefs on the issue. If we are to err, we should err on the side of caution. Unless we are confident that a capital defendant, or any defendant for that matter, has received a fair trial with competent counsel, we should not proceed without being fully apprised of the applicable legal arguments. Our sense of decency as a humane society demands no less than prudence in the face of the ultimate criminal penalty of death. For these reasons, I respectfully dissent. 

Through this dissent, I express no opinion regarding the propriety of the death penalty, nor do I express any opinion in relation to the other issues raised by Chief Justice Harrison’s dissent in 
People v. Bull
, 185 Ill. 2d 179 (1998).

FOOTNOTES
1:      
1
In the interim, the deterrent effect of the death penalty has been brought into serious question. Preliminary statistics compiled by the Illinois State Police show that during the first three quarters of 2000, when the Governor’s moratorium took effect and executions were halted, the murder rate in Illinois actually declined by 9.7% as compared to the same period a year earlier. By contrast, the overall crime rate declined by only 2.5%.